[No. 3377.]

# N. PRYOR *v.* JOHN G. DOWNEY, MATHEW KELLER AND WALLACE WOODWORTH.

ORDER OF PROBATE COURT FOR SALE OF LANDS.—The application of an executor or administrator for the sale of lands belonging to the estate is a special and independent proceeding, and the jurisdiction of the Probate Court to order the sale depends on the facts stated in the petition.

IDEM.—In such proceeding the petition is the commencement of the proceeding, and the order of sale the judgment.

PETITION FOR SALE OF REAL ESTATE.—A petition by an executor or administrator for the sale of real estate must allege all the material facts required by the statute, and if it does not, the Probate Court acquires no jurisdiction to order the sale.

IDEM.—The existence of such material facts, and the proof of the same, do not give the court jurisdiction if the petition fails to aver them.

SALE OF REAL ESTATE BY AN ACTING ADMINISTRATOR.—If the Probate Court makes an order appointing a person administrator, upon the execution of a bond, as required by the statute, and he does not give the bond, or qualify, he does not become an administrator, and if he acts as such, and procures an order for the sale of real estate, and sells the same, the sale is void.

ADMINISTRATOR DE FACTO.—The recognition, by the Probate Court, of a person as administrator, when he has not qualified and received letters, does not make him an administrator *de facto.*

EXECUTOR DE SON TORT.—Under our system there is probably no such thing as an executor *de son tort;* at all events, no man can be an executor *de son tort* in regard to land.

SALE OF LAND BY ONE ASSUMING TO ACT AS ADMINISTRATOR.—An attempted sale of land by one who assumes to act as an executor or administrator, but who has not been regularly appointed, and who has not given the bond and qualified and received letters as such, is void, even if the sale is ordered and approved by the Probate Court.

ACT OF 1863, CONCERNING PROBATE COURTS.—The 46th section of the act of 1863, concerning courts of justice and judicial officers, applies only to Probate Courts to be organized under the constitutional amendments of 1862.

JURISDICTION OF SUBJECT-MATTER IN PROBATE COURT.—The Probate Court has no power to order a sale of real estate to be made by one who assumes to act as an administrator without having been legally appointed; nor has it power to inquire whether a sale is necessary, if the petition is defective, even if in such case all the parties in interest are present in court.

EXERCISE OF JUDICIAL POWER BY THE LEGISLATURE.—An act of the Legislature undertaking to validate a judgment of a court void for want of jurisdiction, is an attempted exercise of the judicial power by the Legislature. Such an act also contravenes the provision of the Constitution: " No person can be deprived of his property without due process of law."

ACT OF APRIL 2, 1866, CONCERNING PROBATE SALES.—The jurisdiction to inquire into the existence of the debts of an estate may be and has been placed in the Probate Court, and the statute of April 2, 1866, ratifying sales of real estate made by the Probate Court, where there are defects or errors—if it has any effect—validates judgments which are otherwise void, and is unconstitutional.

POWER OF LEGISLATURE TO VALIDATE JUDGMENTS.—The Legislature has no power to validate a judgment of the Probate Court directing a sale of real estate, or to validate the sale made by an administrator or executor under such judgment, if the judgment was void for want of jurisdiction to render it.

APPEAL from the District Court, Seventeenth Judicial District, County of Los Angeles.

Ejectment to recover an undivided one-half of a small tract of land in the city of Los Angeles, commenced November 14, 1870.

Nathaniel Pryor, a resident of Los Angeles, died on the 10th day of May, 1850, seized in fee of the demanded premises, along with other lands in Los Angeles, and also leaving personal property. He left, surviving him, a wife, Paula Romero, and two sons, Paul and the plaintiff Nathaniel. The plaintiff was born in September, 1848. By the will, the testator devised to the plaintiff an undivided one-half of the demanded premises, and to his wife the other half.

The will was admitted to probate on the 2d day of July, 1850. The executors nominated in the will refused to qualify, and on the 16th day of January, 1851, Thomas Forster filed a petition for letters of administration.

On February 3, 1851, the court made and entered in its minutes the following order, viz.: "In the matter of the estate of Nathaniel M. Pryor, proof being made to the court that notice has been given according to law of the application for letters of administration now pending, and no person appearing to contest said application, it is ordered by the court that Thomas Forster be appointed administrator with the will annexed, of the estate of Nathaniel M. Pryor, and that he give security according to law, and that until the filing of bond, the said Thomas Forster is appointed special administrator of said estate."

There was found among the papers of the estate, a bond signed by Thomas Forster and John Forster, but it had not been filed or approved by the Probate Court, nor was there any entry in the minutes of the Probate Court in reference to it. Shortly after the date of the bond Forster assumed to act as administrator, and filed petitions and made reports to the court in that capacity, and was treated as such by the court. Said Forster did not, however, take the oath of office, nor were letters of administration issued to him. On the 14th day of January, 1853, Forster filed the following petition asking for an order to sell real estate. The land, described in the petition as half the house and the vineyard lying north of the same, constituted the demanded premises.

" *To the Honorable the Probate Court of Los Angeles County:*

"The petition of Thomas Forster, administrator of the estate of Nathaniel M. Pryor, deceased, represents: That there is no personal property now remaining in his hands, it having been disposed of by previous orders of this court. That the debts outstanding against the estate, as far as the same have been allowed, are as follows, to wit:

Statement of Facts.

| | | |
|---|---:|---:|
| Due David W. Alexander | $545 | 25 |
| "    Alexander & Mellus | 99 | 62 |
| "    Abel Stearns | 24 | 59 |
| "    Paula Romero | 367 | 00 |
| "    Lewis & Rand (Printers) | 41 | 00 |
| "    Family an allowance for their support, from Dec. 29, 1851, to 29th Dec., 1852, at $40 per month | 480 | 00 |
| Total | $1557 | 46 |

"A part of the house and garden is rented for the present year, but the rent will not become due and available until the last day of September of the present year, which will be then $330. There remains on hand, unsold, the following real estate of which the deceased died seized, to wit: One-fifth part of the rancho of Palos Verdes situated in the county of Los Angeles, being the interest which said Pryor derived through his wife, and the same which by will he bequeathed and devised to his son Paul Pryor. Another one-fifth of said rancho, being the interest which said Pryor acquired by purchase of Ignacio Sepulveda, and which by will of said Pryor is devised to his youngest son, Nathaniel Pryor. A vineyard, with house thereon, lying in the city and county of Los Angeles, valued in the inventory at $4180, one-half of said house, with all the vineyard lying south of said house, by said will being devised to said Paul Pryor, and the other half of said house, with all the land lying north of the same, being by said will devised to Paula Romero and to said Nathaniel Pryor. The value of the interest of Paul Pryor in the rancho of Palos Verdes, is $250, and of the youngest son, Nathaniel Pryor, $250, as near as petitioner can estimate the same. The heirs and devisees are Paul Pryor, aged about ten years; Nathaniel Pryor, aged about six years; both the sons of the deceased; together with Paula Romero, widow of the same, aged about thirty years. The value of the personal estate, as shown by the inventory and appraisement, is $1260.50, all of which has been disposed of by order of this court. Your petitioner respectfully represents that the personal property of said estate is insufficient to pay the debts of the same, and he

prays that the court will order the sale of so much of the real estate as may be necessary to pay said debts.

"THOMAS FORSTER,

" By SCOTT & GRANGER, his Attorneys."

The petition was verified, not by the oath of Forster, but by that of Granger, his attorney. The court made an order for the publication of notice to show cause, etc., and fixed the second Friday of February as the day for hearing. The minutes of the court of February 11, 1853, being the second Friday of February, are as follows:

."The administrator appears by Scott & Granger, his attorneys, and files the affidavit of Wm. H. Rand, by which the court is satisfied that the notice required by law for the hearing of the application by petition of said administrator to this court, for order to be given him to sell so much of the real estate pertaining to the estate of the deceased as may be necessary to pay the debts due thereon. And Paula Romero and her son, Nathaniel Pryor, appear by their attorney, J. A. Watson; Paul Pryor also appears by Scott & Granger, the aforesaid attorneys, at the instance of his guardian, Juan Forster; and the said J. A. Watson having filed his objections against the granting the prayer of the administrator for order to sell at this term of the court, Paul Pryor asks leave to file specifications, showing his right, aside from the legacy in the will of his father, to the fifth part of the rancho of Palos Verdes; and also showing that he has paid his share of the debts of said estate with a small exception. Whereupon, it is ordered, by consent of parties being given, that the cause stand adjourned until the March term (regular) of this court, for time sufficient to Paul Pryor to file said specifications."

It nowhere appears from the records, or minutes of the court, or from any paper on file, or otherwise, that Paulo Romero ever qualified or gave bond as guardian of Nathaniel M. Pryor.

It does not appear from the minutes or records of the court, or from any papers on file, or otherwise, that any proceedings were had by the court in reference to the

said petition or the sale prayed for, at the March term of said year, or at any term until the July term.

Of date July 9, 1853, at the July term of said court, the following entries appear in the minutes, viz.: "And now comes the administrator, Thomas Forster, by Scott & Granger, his attorneys; and Nathaniel Pryor, infant son of said Nathaniel Pryor and Paulo Romero de Pryor, widow of said Nathaniel Pryor, and guardian of the said Nathaniel Pryor, appear by William G. Dryden, their attorney; and Paul Pryor, infant son of said Nathaniel Pryor, by John Forster, his guardian, appears by J. R. Scott, his attorney; and the petition of the administrator, filed in this court on the 14th day of January, 1853, is heard by the court, and upon said petition, the allegations of the said Nathaniel Pryor and Paulo Romero Pryor, filed in this court by J. A. Watson, their attorney, on the 11th day of February, 1853, and the proofs; and it appearing to the court that a sale of some part of the real estate of the deceased is necessary to pay the debts of the estate and expenses of administration, and accruing expenses: it is therefore ordered, adjudged and decreed that the said administrator proceed to sell, at the court-house door, in the city of Los Angeles, on the 10th day of August, 1853, at the hour of twelve o'clock, noon, of said day, for cash, the following described real estate of the said deceased, to wit: All the right, title, claim and interest that the deceased acquired in his lifetime, by purchase from Ignacio Sepulveda to one-fifth part of the rancho of Palos Verdes, situate in the county of Los Angeles; and after that shall be sold so much of the north end of the vineyard or garden of the said estate, situate in the city of Los Angeles, to be divided by a division line through said garden or vineyard on a straight line, at right angles with the road running past said vineyard on the east side thereof, as shall be sufficient to pay all the debts due by said estate, together with all the costs and accruing costs of the administration. Notice of said sale to be given by publishing for three successive weeks previous, in the Los Angeles Star."

On the 8th day of August, 1853, Forster filed a petition,

in which he represented that the paper had, by mistake, left out the notice of sale for one week, so that it had not been published for three consecutive weeks, and asking the court to fix another day for the sale. The court granted the petition, and fixed Monday, the 19th day of September, 1853. Forster made the sale, and on the 20th day of September, 1853, filed his return of sale, uby which it appears that notice was published and Paulo Romero became the purchaser for the sum of fourteen hundred dollars. Forster, before making the sale. did not execute the bond required in such cases.

On the 21st day of September, 1853, the next day after the report of sale had been filed, the court made an order confirming the sale, and on the day following, Forster executed and delivered to the purchaser a deed in the usual form. Forster was finally discharged from the administration, and the administration closed on the 30th day of January, 1854. The defendants claimed the demanded premises under the purchaser at the administrator's sale. They were severally in possession of parcels of the same, and answered separately, setting up the statute of April 2, 1866. The plaintiff had judgment in the court below, and the defendants appealed.

The other facts are stated in the opinion.

*James H. Lander,* for the Appellants.

It is jurisdiction, not irregularities committed in the exercise of jurisdiction, that can be impeached in collateral proceedings.

Here, the court having taken, properly, proper and competent jurisdiction, first, of the estate of Pryor, and second, of the "independent proceeding" for sale, and having in that proceeding, with the proper parties before it, made its final decree, the heir cannot, in this action, bring into question irregularities through which the decree was arrived at. And furthermore, an equity against the heir attaches in favor of the purchaser, from the payment of the purchase-money into the estate, not to be divested except by direct proceeding, unless jurisdictional defects appear. (*Haynes*

v. *Meeks,* 10 Cal. 118; *Beauregard* v. *New Orleans,* 18 How.
U. S. R. 502–3; *Thompson* v. *Tolmie,* 2 Pet. 157; *Elliott* v.
*Piersol,* 1 Pet. 328; *Swigart* v. *Harber,* 4 Scam. 364; *Young*
v. *Lorraine,* 11 Ill. 624; *Alexander* v. *Maverick,* 18 Tex.
179.)

The appellants are within the protection of the act respecting probate sales pleaded in their answers, and the same is not unconstitutional. For the statute (see Stats. of 1866, p. 824,) has a retrospective action. It in no way deprives plaintiff of any vested right, and impairs no contract. On the contrary, it protects the right of the purchaser, growing out of her purchase and payment of price, and upholds and enforces the contract of sale made by the administrator in representation of this heir and the other parties interested in the estate.

*Glassell, Chapman & Smith,* for the Respondent.

January 14, 1853, Forster filed his petition for the sale of certain real estate, including the property in controversy.

The petition is not verified by Forster, but by one of his attorneys.

It does not "set forth the amount of personal estate that had come into his hands." All that is said is that "the value of the personal estate as shown by the inventory and appraisement is $1260.50, *non constat* that other personal property had not come into his hands (*Stuard* v. *Allen,* 16 Cal. 501); on the contrary, *constat* from the petition itself that land had already been sold.

Nor does it appear from the petition that the personal property in the hands of Forster was insufficient to pay the charges against the estate.

The petition, indeed, says "that there was no personal property remaining in his hands;" but the facts alleged show that there was at that time a large amount.

The petition does not set forth "a description of all the real estate of which the testator died seized," but only of the unsold portion of it.

The court had no authority to order the sale, and it was void.

We cite, as bearing generally upon the subject, the following authorities: *Clark* v. *Perry*, 15 Cal. 60; *Grimes's Estate* v. *Norris*, 6 Id. 625; *Smith* v. *Andrews*, 6 Id. 654; Bacon's Abridg., title "Courts;" *Beckett* v. *Selover*, 7 Cal. 240; *Townsend* v. *Gordon*, 19 Id. 205–6; *Haynes* v. *Meeks*, 20 Id. 312–14; *Townsend* v. *Tallant*, 33 Id. 45; *Sheldon* v. *Wright*, 5 N. Y. 524; *Atkins* v. *Kennan*, 20 Wend. 249; Cases cited, 5 Abbott's (N. Y.) Dig. 137, n. 9; Cases cited, 3 Id. 119, 701; *Hahn* v. *Kelley*, 34 Cal. 391; *Forbes* v. *Hyde*, 31 Id. 342; *Mill* v. *Martin*, 19 John. 33; *Latham* v. *Edgerton*, 9 Cow. 229.

We call attention particularly to the case of *Sheldon* v. *Wright* (5 N. Y. 524), and *Atkins* v. *Kennan*, therein cited.

The administrator assumed to act as such without authority, and his acts were void. The sale was made by an intruder into the estate. The act of April 2, 1866, if it is to be construed as confirming the judgment and sale in this case, is subversive of the right of property, and therefore in contravention of the first and eighth sections of Article I of the Constitution, the first of which declares the right of "acquiring, possessing and protecting property," to be one of the inalienable rights of man; and the last, that "no person shall be * * * deprived of * * * property without due process of law." (*People* v. *Goldtree*, 44 Cal. 324; *McDaniel* v. *Correll*, 19 Ill. 227; *Nelson* v. *Rountree*, 23 Wis. 369; *Griffin* v. *Cunningham*, 20 Grat. 31; *Richard* v. *Rote*, 68 Penn. St. 255; Cooley on Const. Lim. 83, 371.)

In *Brenham* v. *Story* (39 Cal. 179), it is held that an act authorizing an administrator to sell real estate of the decedent, for the benefit of the estate, is void, on the ground that such authority could only be given to satisfy existing debts.

If the Legislature had no authority to authorize the administrator to sell for the benefit of the heir, it certainly has no right itself to transfer the title for the benefit of other parties, and to the ruin of the heir. (*State* v. *Warren*, 28 Md. 338; *Vanhorne's Lessee* v. *Dorrance*, 2 Dall. 304.)

*James H. Lander, Solomon A. Sharp and Frank G. New-lands,* for the Appellants, in reply.

Respondent claims that the order of sale is void, because of the omission of necessary jurisdictional allegations, and because the court never had jurisdiction of the person of the plaintiff, and for other reasons; and he therefore insists that the act of 1866 cannot by any just construction be applied to this case; that inasmuch as the order of sale was void, there was no sale made under the order of the Probate Court, and nothing which the act can ratify or confirm or make valid.

Admitting for the purpose of argument, that his premises are correct, to wit, that the order of sale is void, we claim that his reasoning reduces itself to an absurdity, for it gravely asserts, in the language of *Harlan* v. *Peck* (33 Cal. 515), that "the defendant in every case would be obliged to allege and prove a valid sale before he could invoke the protection of the statute, or, in other words, he must show that he stands in no need of protection in order to obtain protection."

The Legislature had the constitutional power to pass the law. (*Calder* v. *Bull,* 3 Dall. 386; *Rice* v. *Parkham,* 16 Mass. 226; Comyn's Dig., confirmation, D, Rollins's Abridgment, 583; *Watson* v. *Mercer,* 8 Pet. 108; *Thomson* v. *Lee County,* 3 Wall. 331; *Thornton* v. *McGrath,* 1 Duval (Ky.) 359; *Hess* v. *Werts,* 4 Sergt. & Rawle, 356; *Savings Bank* v. *Allen,* 28 Conn. 97; *Underwood* v. *Libby,* 10 Sergt. & R. 101.)

By the Court, McKINSTRY, J.:

The act of April 2, 1866, reads as follows: "In all cases where real estate has been sold in this State, under the order of the probate courts of the several counties, to purchasers in good faith, and for a valuable consideration, and defects of form, or omissions, or errors exist in any of the proceedings, such sales are hereby ratified, confirmed and made valid, and *sufficient in law* to transfer the title of the property sold; provided, however, that this act shall not affect, in any manner, rights acquired prior to its passage

by vendees, grantees or mortgagees, who claim interests in or liens upon such property under heirs or devisees adversely to such probate sales, nor to sanction in any manner cases of actual fraud." (Statutes of 1865–6, p. 824.)

At the former hearing, this Court expressed the opinion that the words "defects of form, omissions or errors," did not embrace a want of power in the person assuming to act as administrator, or the absence of *jurisdiction* in the court which ordered the sale.

Inasmuch, however, as the members of the court were not unanimous in the construction then given, and in deference to the urgent appeal of counsel, we have given to the principal question suggested the investigation its importance demanded. As the result of such investigation, we are compelled to announce (assuming the act to have been intended to render valid and sufficient in law the formal judgments of the probate courts, in themselves null), that the statute is without effect, in so far as it attempts to validate such *void* judgments.

A long series of decisions in this State—uniformly holding to the same rule—has determined that the application of an executor or administrator for the sale of lands belonging to the estate is a special and independent proceeding; that the jurisdiction of the Probate Court depends absolutely on the sufficiency of the petition; in other words, on its substantial compliance with the requirements of the Probate Act. Though the proceeding for this sale occurs in the general course of administration, it is a distinct proceeding in the nature of an action in which the petition is the commencement and the order of sale is the judgment. The necessity for a sale is not a matter for the executor or administrator to determine, but is a conclusion which the court must draw from the facts stated, and the petition must furnish the materials for its judgment. (*Gregory* v. *McPherson*, 13 Cal. 562; *Townsend* v. *Gordon*, 19 Id. 188; *Gregory* v. *Taber*, Id. 397; *Spriggs's Estate*, 20 Cal. 121; *Haynes* v. *Meeks*, Id. 288.) And the jurisdiction of the Probate Court to order the sale depends on the averments in the petition, and not on the truth of those averments. (*Fitch* v. *Miller*, 20 Cal. 352; *Haynes* v. *Meeks*, supra.)

It is unnecessary to point out the defects in the petition found in the transcript. It is beyond all question that it was insufficient to authorize the court to order this sale. It is certain, therefore, that the judgment, in form, ordering the sale, is utterly *void*, unless the act of April 2, 1866, has given it vitality

Even if we were convinced that the decisions to which we have referred were erroneous, and felt ourselves at liberty, at this day, to hold that the proceeding which led up to the order of sale was merely ancillary to the general administration, and any defects in the petition were but irregularities not affecting the jurisdiction of the court to order the sale, as part of the general proceedings for the settlement and distribution of the estate, there is yet another fact in this record which shows the action of the Probate Court to have been absolutely *void*. It was found by the District Court that Forster was never appointed administrator, but that a conditional order only was made to the effect that he should become administrator, on giving security by filing the bond required by law; and it is further found that he never filed such bond, or otherwise qualified as such administrator. The order for the appointment, the qualification of the appointee, and the issuing of letters to him, were all necessary proceedings to invest such appointee with the office of administrator. (*Estate of Hamilton*, 34 Cal. 464.) The letters of administration may indeed, when issued, be evidence of the regularity of the previous proceedings, but here no letters were ever issued, and it affirmatively appears that no bond was ever filed, nor oath taken. Forster, therefore, was not administrator of the estate, and both the pretended sale by him and the order purporting to authorize it made by the Probate Court—then a court of inferior and limited jurisdiction—were inoperative to transfer to the purchaser any right or estate in the land, legal or equitable. Nor can any recognition by the Probate Court make one an administrator *de facto*. No person can fill that position, except after due appointment and qualification. Under our system, there is probably no such thing as an executor *de son tort;* at all events, no man can be executor *de son tort* in

regard to land.  And generally, it may be said, an executor
*de son tort* is an executor only for the purpose of being sued,
or made liable for the assets with which he has intermed-
dled.  (Bouv. Law Dic.)  It necessarily follows, that an
attempted sale of land of an estate by one not executor
or administrator can transfer no right, even though there
should be a subsequent order of the Probate Court as upon
a final accounting by the pretended administrator.

The forty-sixth section of the act of April 20, 1863, "con-
cerning the courts of justice and judicial officers" (Stats.
1863, p. 336), did not render the order directing the sale
presumptively regular, and within the jurisdiction of the
Probate Court.  It is not necessary to inquire whether that
act is, in other respects, applicable to the facts of the pres-
ent case; it is enough to say that it clearly refers only to
the probate courts to be organized under the constitutional
amendments of 1862, and not to the probate courts previ-
ously existing.  That act repealed the statute of 1853, and
those amendatory thereof, which had provided for the or-
ganization of the courts, and the duties of judicial officers;
such repeal to take effect only when the organization of the
courts under the constitutional amendments should be per-
fected; and it also fully defined the jurisdiction and duties
of the courts and judicial officers under the amendments.
That the rule declared in the forty-sixth section of the act
was not intended to apply *to the old* probate courts is de-
monstrable from the circumstance that it was to take effect
only after those courts had gone out of existence, and when
the new courts had supplanted them.  The *old* Probate
Court—a court of inferior and limited jurisdiction—*ceased*
at the same moment of time that the *new* Probate Court—
whose "records, orders, judgments and decrees" were to
have accorded to them the like force and effect, and legal
presumptions, as those of the District Court—began to exist.

The question which remains to be considered is this:
Has the Legislature power to make a pretended and void
judgment, entered by a court without jurisdiction, valid and
effective for any and all purposes?

Very able jurists have intimated that the courts of some

of the States have gone further than correct principles
would warrant to sustain retroactive laws; a species of leg-
islation always cautiously to be admitted, because obnoxious
to most serious objections.    Nowhere, perhaps, had the
courts gone farther in that direction than in Pennsylvania.
The indignant language of Chief Justice Gibson, in *Gree-
nough* v. *Greenough,* indicates his opinion that such decis-
ions had brought the law of that State to an unenviable
condition.    "In a moral or political aspect," says he, "an
invasion of the right of property is as unjust as an invasion
of the right of personal security.    But retroactive legisla-
tion began and has been continued, because the judiciary
has thought itself too weak to withstand; too weak, because
it has neither the patronage nor the *prestige* necessary to
sustain it against the antagonism of the Legislature and the
bar.    Yet, had it taken its stand on the rampart of the Con-
stitution in the outset, there is some little reason to think
that it might have held its ground.    Instead of that it pur-
sued a temporizing course, till the mischief had become in-
tolerable, and till it was compelled, in *Norman* v. *Heist,* and
*Bolton* v. *Johns,* to invalidate certain acts of legislation, or
rather to reverse certain legislative decrees." (11 Pa. St.
495.)    And the Supreme Court held that in Pennsylvania,
the Legislature could not exercise judicial power, nor take
away property without due process of law.

The repugnance of Chancellor Kent to this species of
legislation appears from his very able opinion in *Dash* v.
*Van Kleecke* (7 Johns, 477).    In his Commentaries, after
saying, "A retrospective statute, affecting and changing
vested rights, is very generally considered in this country as
founded on unconstitutional principles, and consequently
inoperative and void" (vol. 1, p. 456), he adds, that this
does not apply to a remedial statute which may be of a ret-
rospective nature; and he then proceeds to define such
statutes with so many conditions and restrictions as show
how much he was impressed with the danger of an abuse of
the power, unless restrained by constant reference to its
many limitations under our American Constitutions.    Among
these conditions he declares "that it has been held" the

courts may regard the circumstance that a law "is clearly just and reasonable," but he is careful not to commit himself to the statement that such matters may be at all considered when the sole question is one of legislative power. The reference seems to be to *Goshen* v. *Stonington* (4 Conn. 209), a judgment which may be sustained on other grounds, but where the court seems to have relied on the aphorism of Bacon, that retroactive laws ought not to be passed, *nisi ubi leges cum justicia retrospicere possint.* But the Connecticut case was not decided on the broad ground that such laws may be enacted in an American State whenever they appear to be just and reasonable, nor could it have been without a clear violation of fundamental principles.

In both instances referred to in the "Commentaries," and which are ordinarily referred to as illustrations of the power to pass retroactive laws, being statutes to confirm former marriages defectively celebrated, and to confirm sales of land defectively acknowledged, the contracts were such as would have been valid at the common law, and the effect of the subsequent statute was simply to remove an obstacle created by a former statute. The author remarks: "The legal rights affected in those cases by the statute were deemed to have been vested subject to the equity existing against them, and which the statute recognized and enforced." And statutes to cure defective acknowledgments, seem originally to have been sustained on the theory that the vendor upon established principles of equitable cognizance, had parted with the title to the land. Thus, in *Chesnut* v. *Shane's Lessee* (16 Ohio, 599), the Supreme Court of Ohio expressly say of such a curative act: "It operates only on that class of deeds when enough has been done to show that a Court of Chancery ought in each case to render a decree for a conveyance, assuming that the certificate was not such as the law required. And when the title was such that equity ought to interfere and decree a good legal title, it was within the power of the Legislature to confirm the deed, without subjecting an indefinite number to the useless expense of unnecessary litigation."

Nowhere does Chancellor Kent intimate an opinion, that

the Legislature can validate a pretended judgment of a court, rendered without the acquisition of jurisdiction, or that it can annul a valid judgment. He closes his remarks on the subject with the warning: "The cases cannot be extended beyond the circumstances on which they repose, without putting in jeopardy the energy and safety of the general principles." Nor can the power to validate a *void* decree be employed indirectly, by declaring how a judicial question— arising on the law as it stood prior to the declaratory statute—ought to have been decided. As suggested in a note (1 Kent. Com. 456): "It seems to be settled as the sense of the courts of justice in this country, that the Legislature cannot pass any declaratory act, or act declaratory of what the law was before its passage, so as to give it any binding weight with the courts." And this position is supported by an abundance of authority.

The Legislature of California cannot exercise any judicial function, and no person in this State can be deprived of life, liberty or property without due process of law. (Constitution, Art. III; Art. I, Sec. 8.)

It would be very difficult, if not impossible, to harmonize the decisions of the courts of the several States of the Union relative to the subject we are considering, although the divergence in the reasoning of the courts is not so great as the judgments would seem to indicate. But it has always been held where a Constitution similar to our own exists, that the Legislature can neither exercise judicial power nor deprive a citizen of his property, except by the law of the land; the doubt sometimes being, what is the property, or the vested rights, of which he may not be so deprived. In the present case it cannot be pretended that the purchaser at the Forster sale acquired any equitable estate, which he could make the foundation of an action against the heirs or devisees, and that the effect of the statute was to transform an equitable into a legal title. (*Chesnut* v. *Shane's Lessee, supra.*) As to any vague, indeterminate and indeterminable "moral equity"—if any such exist—it may well be doubted whether we can recognize such, since the courts have no standard by which to estimate its sufficiency or

effectiveness. Even if we could adopt, however, the meas-
ure of right suggested by some of the cases, we are not
prepared to hold that the plaintiff in this action may not in-
sist upon his complete legal and equitable title, without vio-
lating any principle of morality. (9 Gill, 299.) Admitting that
the estate of the ancestor comes to the heir burdened with
the debts of the former, it is still the right of the latter—
when courts are organized or are required by the Constitu-
tion to be organized, for the settlement of the estates of
decedents—to have the debts ascertained and the property
applied by a tribunal of competent jurisdiction. And,
upon any theory, the doctrine of estoppel—which is claimed
to impose an imperfect duty capable of being ripened into
a perfect obligation by the legislative will—can have no ap-
plication, unless a party by his own contract, or other vol-
untary act, has placed himself in such an attitude that it
would be a violation of sound morality on his part for him
to adhere to and insist on his legal and equitable rights.
It ought not to be made to apply to this plaintiff merely
because he was a party, as an infant, to a pretended legal
proceeding.

It would seem to have been said by the Supreme Court
of Indiana, that a void judgment could be rendered valid
by a subsequent act of the Legislature. (*Walpole* v. *Elliott*,
18 Ind. 259.) But, as is pointed out by Judge Cooley
(Const. Lim. 383, note 3), the language employed was
broader than the facts called for, since, in that case, there
was not a failure of jurisdiction, but an irregular exercise
of it. And that learned writer thus lays down the rule as
to retrospective statutes in respect to legal proceedings:
"In judicial proceedings, if there was originally a failure
of jurisdiction, no subsequent law can confer it." (Const.
Lim. 383.) "A retrospective statute curing defects in legal
proceedings where they are in their nature irregularities
only, and do not extend to matters of jurisdiction, is not
void on constitutional grounds, unless expressly forbidden."
(Id. 371.)

In *Nelson* v. *Rountree*, the Supreme Court of Wisconsin
treat as "not to be discussed at this day" the proposition

that the Legislature is competent to declare that to be a judgment which before was no judgment. (23 Wis. 370.) And in reference to the statute of 1866, may be repeated what was said by the Supreme Court of Illinois, in respect to a statute not very dissimilar: "If it was competent for the Legislature to make a void proceeding valid, then it has been done in this case. Upon this question we cannot for a moment doubt or hesitate. They can no more impart a binding efficacy to a void proceeding than they can take one man's property from him and give it to another. Indeed, to do the one thing is to accomplish the other." (*McDaniel* v. *Correll*, 19 Ill. 228.)

As we have seen, the order of the Probate Court directing the sale by Forster, and the sale of the 19th of September, 1853, were *void*. If prior to the enactment of April 2, 1866, the validity of the sale in question had been presented to this Court, even in a collateral proceeding, we must have held, both upon reason and authority, that it transferred to the purchaser no estate in the land. Had the District and Supreme Court in fact decided the sale by Forster to be void, and the Legislature had then enacted that the judgment should be set aside, and the validity of such sale again be made the subject of judicial inquiry, the interference by the Legislature with a distinct department of the government would be palpably apparent to every mind. In every case, and the instances are few, in which such a law has been passed upon by the courts of a State having a written constitution, it has been declared unconstitutional; even when there was in the written constitution no express provision prohibiting the Legislature from exercising judicial power. But had the Legislature gone one step further, and, by special enactment or by general law covering the case, commanded the courts which had rendered a judgment in favor of a plaintiff, in an action based on the invalidity of the Forster sale, to set it aside and to enter a judgment for the defendant, such arbitrary attempt would, at once, have been recognized as an abuse not to be tolerated under our free constitution of government.

The circumstance that the validity of this very order of

sale had never been before the courts, does not make the statute (assuming that it applies to such order) any the less an effort summarily to dispose of a question purely judicial, or to deprive citizens of their property "without due process of law." This last expression is the equivalent of "the law of the land;" a law which, as said by Mr. Webster in the Dartmouth College case, "hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial."

If we assume the act to have validated the Forster sale (and order of sale), then the lands which up to the date of the act—April 2, 1866—belonged to the heirs of Nathaniel M. Pryor, from that date became the property of other persons, and this transfer was accomplished by the legislative act alone. And even if we could indulge the fiction that the parties to be deprived of their estates had notice of the intended act, and a hearing and opportunity to produce witnesses, or to show cause why the act should not be passed, this would have been a species of trial, and the exercise of judicial power by the Legislature.

Sections 154 and 155 of the Probate Act of 1851, read as follows:

"When the personal estate in the hands of the executor or administrator shall be insufficient to pay the allowance to the family and all the debts and charges of the administration, the executor or administrator may sell the real estate for that purpose upon the order of the county judge. To obtain such order he shall present a petition to the Probate Court, setting forth the personal estate that has come to his hands, and how much thereof, if any, remains undisposed of; the debts outstanding against the deceased, as far as the same can be ascertained; a description of all the real estate of which the testator or intestate died seized; and the condition and value of the respective portions and lots; the names and ages of the devisees, if any, and of the heirs of the deceased; which petition shall be verified by the oath of the party presenting the same."

It cannot be doubted that the effort to ascertain the existence or non-existence of the facts which, under the

law, can alone authorize a sale of real estate, is a judicial inquiry, and that the finding of facts which must precede the order of sale is a judicial finding. The determination that a sale is necessary for a purpose stated in the petition is an adjudication, and the power thus to adjudicate may be, and has been, appropriately placed in the Probate Court, a judicial tribunal expressly named as such in the sixth article of the Constitution, which treats of the "judicial department."

As appears, however, in the present case, the petition was fatally defective, and the Probate Court had no power to authorize Forster (not an executor or administrator) to make a sale. We can discover no well-founded distinction between a want of jurisdiction as to the persons of parties to a proceeding, and an entire failure of jurisdiction as to the subject-matter, such as appears by this record. In Massachusetts, if, when a widow presents her petition to the Probate Court to have her homestead set off, the heirs dispute her claim, the issue between her and them must be tried in some other court. But, notwithstanding the opposition of the heirs, the Probate Court heard the matter, and after a trial, *in which all parties in interest participated*, entered a decree denying the petition, on the ground that the widow had no homestead. In proceedings before a court of competent jurisdiction, she afterwards sought to assert her claim to a homestead. Her claim was opposed on the ground, amongst others, that her right had been terminated by the decree of the Probate Court. But the Supreme Court of Massachusetts held, notwithstanding the Probate Court had fully acquired jurisdiction of the *persons* of all interested, and, but for the opposition of the heirs, would have had power to enter the decree, that the decree was absolutely void. (Freeman on Judgments, 264; *Mercier* v. *Chace,* 9 Allen, 242.) Had all interested in Pryor's estate been present when the order of sale was made (as it is claimed they were), the court would have had no power to order a sale by one on whom the power to sell could not be legally conferred; nor to inquire, in the absence of a *petition,*

whether a sale was legally necessary for any purpose *which might have been set forth* in a proper petition.

As the proceeding in the Probate Court was void, no adjudication was made prior to the act of April 2, 1866, and, as we have seen, the Legislature cannot adjudicate upon the legal rights of parties. Such questions as are judicial in their nature are not to be settled arbitrarily or capriciously, but by the application of fixed rules and established principles. A judgment must be the result "of due inquiry, sufficient to satisfy the discretion and convince the judgment of the officer of the law, in whom the authority and jurisdiction to decide the questions involved have been duly vested." (*Denny* v. *Mattoon,* 2 Allen, Mass. 380.) Until such adjudication, no proper foundation is laid for the order of sale, nor in the absence of such adjudication by the court of competent jurisdiction, can the property of heirs or devisees be said to be taken from them by due process of law. If they are to be held to all the consequences which would have followed from a proper and valid adjudication, it must be by virtue of the act of 1866, and not by virtue of any judgment of the Probate Court. Such a statute constitutes an attempted exercise of the judicial power by the Legislature; it is not for those who seek to uphold such exercise of power to say that it is not judicial, because not employed after due notice, or a trial of any issue of law or fact.

It may be claimed, however, that the statute of 1866 is strictly remedial; that it goes only to the curing of irregularities, and does not extend to matter of jurisdiction within the rule which prohibits such legislation. On this point it has been said: "We know of no better rule to apply to cases of this description than this: If the thing wanting, which failed to be done, and which constitutes the defect in the proceedings, is something which the Legislature might have dispensed with the necessity of by prior statute, then a subsequent statute dispensing with it retrospectively must be sustained." (Cooley, Const. Lim. 371.)

It may be admitted, perhaps, that a general law would be valid which authorized executors or administrators to obtain

orders of sale on *ex parte* applications; or to sell real property, for the payment of debts, without notice to the heir, or application to any court.   Possibly, also, a special law, to the effect last mentioned—(held not to be an exercise of judicial power in *Watkins* v. *Holman*, 16 Pet. 61)—might not be a violation of any part of our Constitution except the provision: "All laws of a general nature shall have a uniform operation."   But it has been expressly decided in this State that the Legislature cannot authorize a sale by an executor or administrator, except in satisfaction of the liens of creditors, or for the support of the family, or expenses of administration.   (*Brenham* v. *Story*, 39 Cal. 179).   And when such prospective laws providing for a sale to pay debts have been sustained, it has been held that they decide no fact binding upon heirs, devisees or creditors; but as to them the executor or administrator acts subject to an accountability in a court of chancery for the correct performance of his trust in this as in other parts of his duty.   (16 Pet. 62.)

It may be doubted, whether under our Constitution, which distributes the judicial power throughout a system of courts, the question of the existence or non-existence of debts, etc., could be referred to the District Court, to be determined only when suit was brought by heirs or devisees to make the executor or administrator responsible for the abuse of his trust.   However this may be, it is quite certain that the jurisdiction to inquire into the existence of debts may be, and by the general probate law has been, placed in the Probate Court, and the effect of the statute of 1866—if it be held effective at all—is to make a void judgment valid.

We say, then, that the question as to the existence of debts, insufficiency of personalty, etc., and consequent necessity for a sale of real property, is a judicial question, and the Legislature cannot decide it.   If it be alleged that the Legislature has not attempted to decide it, the reply is, that the statute of 1866 has left to the heirs or devisees no defense against a title asserted by a purchaser at such sale, except *actual fraud* or collusion between the purchaser and

executor or administrator; that by its terms no remedy is given to the heirs or devisees against the executor or administrator personally; but, on the contrary, the very object of the statute, as claimed by the appellants herein, is to validate the whole proceeding, and to make it as effectual in law as if it had been conducted in precise compliance with the statutes; that, assuming the statute to be applicable to void judgments and sales, the purpose is perfectly apparent to validate such judgments and sales, without reference to the existence of debts, and in spite of their non-existence. This the Legislature was powerless to do, because, to apply the rule as laid down by Judge Cooley, "the thing wanting" was not a thing which the Legislature "might have dispensed with the necessity of by prior statute

If it can be said, in any sense of the words, that the act of 1866 is not the exercise of judicial power, it is only because there is provided in it no pretense of judicial inquiry —no day in court for the parties to be affected by it—no course of investigation—no saving of private rights, or recognition of the principles of distributive justice.

If for such reasons the statute is not an exercise of judicial functions, then, as was said by the Supreme Court of Massachusetts, "it certainly is a violation of another fundamental principle of the Constitution. It takes from the subject his property, not by due process, or by the law of the land, but by an arbitrary exercise of the legislative will." (*Denny* v. *Mattoon, supra.*) Prior to 1848, the courts of Pennsylvania had often decided that a testator's "mark" at the foot of a testamentary paper was not a valid signature; had repeatedly construed their statute of wills as the California courts (prior to the act of 1866) had repeatedly construed our statute relating to sales of lands by executors or administrators. To "overrule" these decisions, as Mr. Sedgwick aptly expresses it (Stat. and Const. Law, 349), the Legislature of Pennsylvania, in 1848, passed an act declaring that every will theretofore made, to which the testator had made his mark, should be valid. In *Greenough* v. *Greenough (supra)*, Gibson, C. J., said: "How this mandate to the court to establish a particular interpretation of a par-

ticular statute can be taken for anything else than an exercise of judicial power in settling a question of interpretation, I know not." And, in the same case: "The statute is destitute of retroactive force, not only because it is an act of judicial power, but also because it contravenes the declaration in the Constitution, that no person shall be deprived of life, liberty or property, except by the judgment of his peers, or the law of the land."

Our conclusion is, that the act of April 2, 1866, is in conflict with the provision of the Constitution of the State which prohibits the Legislature from exercising judicial functions; that it also contravenes the provision that no person can be deprived of his property without due process of law, and that it is, therefore, void.

The purchaser "in good faith" mentioned in the statute, could only be one who bought in ignorance that the sale was invalid in law, and who in that respect was in the same position as are all who part with their money in ignorance of their legal rights. If he, or his assignee, shall complain of the hardship of losing the purchase-price, it can only be said—however the fact may be regretted—that the hardship was suffered before the act of 1866 was passed, and was the consequence of an existing rule of law and of his own ignorance of that rule. From September 19, 1853, to April 2, 1866, a period of nearly thirteen years, the purchaser, or his grantee, had no right, title, or interest in the land; and if he had any right of action against Forster or the heirs to recover the money paid, he did not assert it. The hardship, if any, therefore, is not inflicted by the act of this Court in simply discharging its duty of declaring the statute of none effect.

Judgment affirmed.