[S.F. No. 24217. June 18, 1981.]

SHELLEY MANDEL, Plaintiff and Respondent, v.
BEVERLEE MYERS, as Director, etc., et al., Defendants
and Appellants.

532

COUNSEL

George Deukmejian, Attorney General, Charlton Holland and Edward P. Hill, Deputy Attorneys General, for Defendants and Appellants.

John Howard Sullivan as Amicus Curiae on behalf of Defendants and Appellants.

Richard M. Kaplan, Ephraim Margolin, Nicholas C. Arguimbau, James J. Brosnahan and Morrison & Foerster for Plaintiff and Respondent.

Fred H. Altshuler, Stephen P. Berzon, Evelyn R. Frank, Altshuler & Berzon, John E. McDermott, Richard A. Rothschild, William S. Boyd, Patricia S. Brody, Thomas W. Kellerman, Rebecca D. Strause,

Brobeck, Phleger, & Harrison, Jerome B. Falk, Jr., Howard, Prim, Rice, Nemerovski, Canady & Pollak, Robert M. Cassel, Mortimer H. Herzstein, Herbert M. Rosenthal, Magdalene Y. O'Rourke, Frederick E. Watson and Richard J. Sciaroni as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**TOBRINER, J.**—The present appeal—the third in this protracted proceeding—stems from plaintiff's repeated efforts to enforce a portion of a court judgment awarding her $25,000 in attorney's fees, entered against the various defendant state agencies and officers in April 1973, eight years ago. Shortly after the entry of the 1973 judgment, defendants filed their initial appeal, challenging, inter alia, both the propriety of any attorney fee award and the amount of the award granted in this case. In a decision rendered in January 1976, the Court of Appeal fully considered defendants' contentions and affirmed the attorney fee award in its entirety. (*Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596 [127 Cal. Rptr. 244, 90 A.L.R.3d 728] (*Mandel I*).) Our court subsequently denied defendants' petition for hearing and, as a consequence, the trial court judgment, including the attorney fee award, became final.

Despite the finality of the judicial ruling, however, the state defendants have not as yet paid the amount due under the judgment. After plaintiff's counsel had unsuccessfully attempted to obtain voluntary compliance on a number of occasions, the trial court in January 1979 issued an order directing, inter alia, the State Controller to pay the attorney fee award out of funds appropriated in the 1978-1979 Budget Act for the operating expenses of the Department of Health Services, the principal defendant agency in the underlying case. The defendants now appeal from this order, contending that the ruling exceeds the authority of the trial court and violates the constitutional separation of powers doctrine. We conclude that the trial court order sustains, rather than transgresses, constitutional principles and accordingly we affirm the order.

As we shall explain, the court order at issue in this case does not purport to compel the Legislature either to appropriate funds or to perform any other legislative act which might violate established separation of powers principles. Instead, the order simply directs an appropriate state

official, the State Controller, to pay a specified sum out of funds that the Legislature has already appropriated. The governing precedents firmly establish that such an order violates no separation of powers principle.

Although recognizing that the order does not compel a legislative act, defendants argue that the general operating expense budget item at which the order is directed was not in fact intended for the payment of the type of expenses—court-awarded attorney fees—at issue here. The budget act, however, defines the permissible use of the funds in question in broad language which naturally and reasonably encompasses the payment of attorney fees, and, as we shall see, comparable budget appropriations have frequently been utilized in the past by a variety of agencies to pay similar attorney fee awards.

Defendants further claim that even if the agency's operating expense budget was generally available for payment of attorney fees, the appropriation in the 1978-1979 budget must be interpreted as excluding funds for the specific attorney fee award at issue here because a legislative committee deleted a separate line-item appropriation proposed for this fee award. As we explain, however, the Legislature has provided no formal explanation for the distinct adverse treatment accorded this particular fee award and on the record before us the legislative action is explicable only as an impermissible legislative "readjudication" of the merits of the underlying final court judgment in this case. Because the very separation of powers doctrine upon which defendants rely precludes the Legislature from establishing itself as a "court of last resort" to review final court judgments on a case-by-case basis, the exclusion of this particular fee award from an otherwise available general appropriation on such a basis cannot stand. Accordingly, the trial court properly determined that the appropriation in question was available for payment of the attorney fee award in this case.

Finally, we shall explain that, contrary to defendants' fears, the trial court order in this case in no way deprives the Legislature of its broad and ultimate control over state expenditures. As we shall point out, the Legislature may restrain and limit state expenditures in this area by adopting any one or more of a host of alternative, generally applicable statutory measures. Our present decision simply recognizes that while legislative authority in fiscal matters is very broad, the separation of powers doctrine precludes the Legislature from according differential treatment in the payment of specific attorney fee awards on the basis of

its own case-by-case readjudication of the very issues that the state has already litigated and lost in the underlying judicial proceeding.

## 1. Factual and procedural background

Plaintiff, an employee in the Department of Health Services, instituted the underlying action in 1972, challenging—as an unconstitutional establishment of religion—the department's practice of affording state employees three hours of paid time off on Good Friday. The trial court agreed with plaintiff's constitutional challenge to the existing state practice, and entered a judgment which, inter alia, enjoined the Controller from paying state employees for time taken off from work on Good Friday. In addition, the trial court, finding that "[t]he efforts of Petitioner's attorneys have resulted in a substantial benefit derived by Petitioner's class and the public at large and the saving to the State of approximately $2,000,000 in 1973 alone, and further saving which can reasonably be anticipated in years to come . . .," included in the judgment an attorney fee award of $25,000.

The state defendants appealed from the judgment, contesting both the trial court's substantive establishment clause ruling and the award of attorney fees. The Court of Appeal, in an extensive opinion, affirmed the judgment in its entirety. (*Mandel I, supra,* 54 Cal.App.3d 596.) With respect to the attorney fee award, the Court of Appeal specifically addressed defendants' objections to both the validity of any award whatsoever and to the specific amount awarded by the trial court in this case, and upheld the award in all respects. (*Id.,* at pp. 619-624.) Thereafter, our court denied the defendants' petition for hearing.

Having obtained a final judgment against the Department of Health Services and other state defendants, plaintiff commenced efforts to obtain payment of the $25,000 attorney fee award. Upon the advice of the Attorney General, who had represented, and continues to represent, the defendants in this action, plaintiff filed a claim for the payment of the $25,000 with the State Board of Control. The Board of Control approved the claim in August 1976, and included the amount in an omnibus claim bill that was introduced in the Legislature in 1977. The Legislative Analyst opposed the appropriation, however, and the item was deleted from the bill in legislative committee proceedings that year.

Acting again upon the advice of the Attorney General, plaintiff refiled a claim for the $25,000 the following year. Once again the claim

was approved by the Board of Control, and this time a specific appropriation for payment of the award was requested in the budget submitted by the Governor to the Legislature for fiscal year 1978-1979. The Legislative Analyst, however, in his report to the joint legislative budget committee, once again recommended against the appropriation. The report indicates that the Legislative Analyst took no note of the binding effect of a final court judgment and that his recommendation rested quite unambiguously upon a reevaluation of the merits of the attorney fee award that had been fully litigated and resolved in the prior judicial proceedings.[1] Thereafter, the specific appropriation for the attorney fee award was deleted in committee proceedings on the 1978-1979 budget bill.[2]

Plaintiff then returned to the trial court and filed a motion seeking an order to facilitate the enforcement of the $25,000 attorney fee award. After briefing and oral argument, the trial court granted the motion and entered the order at issue in this appeal. The order, inter alia, directs the State Controller to pay $25,000 plus interest "from the funds of the Department of Health Services pursuant to Item 244(b) of

---

[1] In explaining his recommendation against payment of the claim, the Legislative Analyst stated: "In our analysis of the claims bill dated February 18, 1977, we recommended against payment and noted the following:

"(1) In the absence of a controlling statute or an agreement between the parties, attorney fees are generally not awarded to successful litigants in American courts. (There was no express or implied agreement relative to attorney fees in this case.)

"(2) This was the first case in which attorney fees would be awarded against the state without specific statutory authority.

"(3) The fee awarded by the court represented an attorney charge of $83 an hour compared to the 1977 charges by the Office of the Attorney General of $33.10.

"(4) There was reason to question the number of attorney hours that were awarded for payment by the court. (The court did not review the total number of hours spent preparing and trying the case, the manner in which the time was spent or the attorneys' normal billing rates.) [¶] This case did not involve a formal trial. Court time consisted solely of arguing a brief during one afternoon. The Office of the Attorney General indicated that a reasonable amount of time spent by the claimants on this case would be about one week, or 80 hours for both attorneys." (Rep. of Legis. Analyst, Analysis of the Budget Bill for the Fiscal Year July 1, 1978 to June 30, 1979, p. 1042.)

[2] At the time of the legislative action, the state's second appeal in this proceeding, concerning an attorney fee award for services rendered in the *Mandel I* appeal, was pending before the Court of Appeal. The Court of Appeal subsequently reversed the appellate attorney fee award and remanded the matter for reconsideration and recomputation. (*Mandel* v. *Lackner* (1979) 92 Cal.App.3d 747 [155 Cal.Rptr. 269] (*Mandel II*).) No issue concerning the appellate attorney fee award is presented in the instant proceeding.

the Budget of the State of California;"[3] item 244(b) appropriates funds to the department for "[o]perating expenses and equipment." As noted above, defendants challenge the order as a violation of the separation of powers doctrine.

2. ■ *Although the separation of powers doctrine generally bars a court from compelling the Legislature to enact an appropriation bill, once the Legislature has appropriated funds the constitutional doctrine does not preclude a court from ordering state officials to disregard invalid restrictions upon the expenditure of such funds.*

In the instant appeal, the Attorney General does not attempt to explain or to justify the Legislature's refusal to honor the final court judgment rendered in the initial appeal in this case. Instead, the Attorney General argues that regardless of the propriety or impropriety of the legislative action, the trial court exceeded its authority by entering an order which the judiciary, under the separation of powers doctrine, has no power to impose.[4] Relying on the venerable precept which declares that a court may not compel the Legislature to enact a legislative measure, the Attorney General maintains that the trial court order in this case is inconsistent with numerous authorities which hold that a court may neither directly compel the Legislature to appropriate funds nor order the payment of funds that have not been appropriated by the Legislature. (See, e.g., *Myers* v. *English* (1858) 9 Cal. 341, 349; *Westinghouse Electric Co.* v. *Chambers* (1915) 169 Cal. 131, 135 [145 P. 1025]; *California State Employees' Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 108-109 [108 Cal.Rptr. 251]; *Veterans of Foreign Wars* v. *State of California* (1974) 36 Cal.App.3d 688, 697 [111 Cal.Rptr. 750].)

---

[3]The dispositive text of the order reads in pertinent part: "IT IS ORDERED, ADJUDGED AND DECREED as follows:

"1. That the award of attorneys' fees to [respondent's attorneys] of $25,000.00 in the judgment of April 6, 1973, in this cause, shall be, and it hereby is, deemed to be costs within the meaning of Code of Civil Procedure Section 1028; and,

"2. Defendants BEVERLEE MYERS, Director of the Department of Health Services, and DEPARTMENT OF HEALTH SERVICES OF THE STATE OF CALIFORNIA, and KENNETH J. CORY, State Controller, and STATE OF CALIFORNIA, are ordered to pay to [the attorneys] the said sum of $25,000.00, plus interest from April 6, 1973, from the funds of the Department of Health Services pursuant to Item 244(b) of the 1978-79 Budget of the State of California . . . ."

[4]In California, the separation of powers doctrine is embodied in article III, section 3 of the California Constitution which provides: "The powers of state government are legislative, executive and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

Although, as the cases relied on by the Attorney General indicate, the separation of powers doctrine has generally been viewed as prohibiting a court from directly ordering the Legislature to enact a specific appropriation, it is equally well established that once funds have already been appropriated by legislative action, a court transgresses no constitutional principle when it orders the State Controller or other similar official to make appropriate expenditures from such funds. (See, e.g., *Fowler* v. *Peirce* (1852) 2 Cal. 165, 167; *McCauley* v. *Brooks* (1860) 16 Cal. 11, 33-35, 39-47; *Flora Crane Service, Inc.* v. *Ross* (1964) 61 Cal.2d 199, 204-207 [37 Cal.Rptr. 425, 390 P.2d 193]. See generally 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 74, pp. 3850-3851.) Although such an order will normally issue only when the Legislature has authorized the use of the appropriated funds for the purpose for which an expenditure is sought, a variety of cases demonstrate that under some circumstances a court decision implementing constitutional rights may result in the expenditure of funds in a manner that the Legislature has not contemplated and yet pose no separation of powers problems whatsoever.

The case of *Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322] provides an instructive example. In *Shapiro* the State of Connecticut enacted a welfare program which provided benefits to needy persons in the state but which excluded otherwise eligible recipients who had lived in the state for less than one year. The state Legislature appropriated funds to pay for the program with the obvious intent that the appropriated funds not be spent on the excluded class. In *Shapiro*, however, the United States Supreme Court struck down the intended exclusion as unconstitutional and as a result the appropriated funds were made available to persons whom the Legislature had not intended to benefit. Nothing in *Shapiro*, or indeed, in any of the other numerous recent decisions invalidating comparable unconstitutional restrictions in public benefit programs, suggests that a judicial decision which extends appropriated funds to an improperly excluded class violates the separation of powers doctrine. (See, e.g., *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250 [39 L.Ed.2d 306, 94 S.Ct. 1076]; *Califano* v. *Goldfarb* (1977) 430 U.S. 199 [51 L.Ed.2d 270, 97 S.Ct. 1021].)

In *Shapiro* and the other similar cases cited above, an unconstitutional restriction was appended to the statutory provisions governing a general benefit program rather than to a specific appropriation bill. In

other instances, however, a legislative body has imposed improper restrictions or exclusions directly in an appropriation bill itself. As in the *Shapiro* line of cases, the judicial authorities establish that when such a restriction in an appropriation measure is found invalid, a judicial decision requiring the payment of funds without regard to the improper restriction does not violate the separation of powers doctrine.

This court's decision in *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441 [343 P.2d 8] illustrates the point. In *Levit*, the Legislature in an annual budget bill appropriated a designated fund for public school textbooks, but appended to the appropriation a proviso which read: "None of the moneys appropriated by this item shall be expended for publishing, purchasing, shipping or paying royalties for the books known as 'Science for Work and Play' and 'Science for Here and Now.'" (Stats. 1959, 2d Ex. Sess. 1958, ch. 1, item 435, p. 558.) In *Levit*, our court concluded that while the Legislature possessed the power to decline to appropriate funds for any science textbooks at all, it had no authority to enact the specific proviso at issue because the California Constitution specifically delegates the power of textbook selection to the State Board of Education, not the Legislature. (See Cal. Const., art IX, § 7.5.)

Having concluded that the particular restriction on appropriated funds was invalid as an improper legislative usurpation of the Board of Education's authority, we went on to hold in *Levit* that "[t]he declaration that the restrictive provision in item 435 is invalid does not affect the validity of the appropriation itself." (52 Cal.2d at p. 466.) In line with this conclusion, we issued a peremptory writ, directing the Controller "to consider the printing orders involved without regard to the ineffective restriction contained in [the budget act]." (*Ibid.*)

The United States Supreme Court applied a similar analysis in its decision in *United States* v. *Lovett* (1946) 328 U.S. 303 [90 L.Ed. 1252, 66 S.Ct. 1073]. In *Lovett*, the United States Congress, after conducting a summary investigation of a number of federal employees and concluding that several were guilty of "subversive activity," adopted as part of a pending appropriation bill a provision which stated that "[n]o part of any appropriation . . . which is made available under . . . this Act . . . , shall be used . . . to pay any part of the salary, or other compensation of the personal services, of Goodwin B. Watson, William E. Dodd, Junior, and Robert Morss Lovett . . . ."

Although Congress argued in *Lovett* that the provision in question "involved simply an exercise of congressional powers over appropriations which . . . are plenary and not subject to judicial review" (328 U.S. at pp. 306-307 [90 L.Ed. at p. 1255]), the Supreme Court emphatically rejected the argument and concluded that the restriction in question amounted to a punitive bill of attainder which the Legislature was not authorized to enact. (U.S. Const., art. I, § 9, cl. 3.) Having determined that the attempted limitation on the use of appropriated funds rested upon the improper exercise of legislative authority, the *Lovett* court struck down the restriction and held that the challenged provision "does not stand as an obstacle to payment of compensation to Lovett, Watson and Dodd." (328 U.S. at p. 318 [90 L.Ed. at p. 1261].)

■ Thus the *Levit* and *Lovett* decisions clearly demonstrate that while the separation of powers doctrine may restrict a court from directly ordering the Legislature to enact an appropriation law, the doctrine does not preclude the judiciary from decreeing that funds that have been appropriated by the Legislature should be paid without regard to an improper or invalid legislative restriction. If, in the absence of such invalid restriction, appropriated funds are reasonably available for the expenditures in question, the separation of powers doctrine poses no barrier to a judicial order directing the payment of such funds.

The teaching of *Levit* and *Lovett* is directly relevant in the present case because the trial court order at issue here does not compel the Legislature to appropriate funds. Instead, the order simply directs the State Controller to pay the sum in question out of funds that have already been appropriated. Accordingly, in determining the propriety of this order, we turn to the question of whether the trial court could properly conclude that the appropriated funds at which the order is directed were reasonably available for payment of the attorney fees in question.

3. ■ *The trial court properly concluded that the general "operating expense" appropriation to the Department of Health Services was available for the payment of court-awarded attorney fees against the department.*

As noted above, the trial court order in question directs the Controller to pay $25,000 plus interest "from the funds of the Department of Health Services pursuant to Item 244(b) of the 1978-79 Budget of the State of California." Item 244(b) of the 1978-1979 Budget Act appropriated more than $37 million for "[o]perating expenses and

equipment" of the Department of Health Services (Stats. 1978, ch. 359, § 2, item 244(b), p. 817) and the Attorney General concedes that at the time the trial court entered its order more than sufficient funds remained in this budget item to cover the expenditure in question. (See Gov. Code, § 12440: cf. *Baggett* v. *Dunn* (1886) 69 Cal. 75 [10 P. 125]; *Marshall* v. *Dunn* (1886) 69 Cal. 223 [10 P. 399].) The Attorney General maintains, however, that the trial court erred in concluding that the funds in question could properly be used for payment of court-awarded attorney fees. We cannot agree.

The 1978-1979 Budget Act itself defines the "operating expenses and equipment" category of departmental budgets in terms that are clearly broad enough to encompass court-awarded attorney fees. Section 26, subdivision (b) of the budget act provides that the term "operating expenses and equipment" as used in the act "shall include all expenditures for purchase of materials, supplies, equipment, *services* (other than services of state officers and employees), *and all other proper expenses.*" (Italics added.) (Stats. 1978, ch. 359, § 26, subd. (b), p. 1013.)

On its face, the payment of a court-awarded attorney fee would appear clearly to constitute "[an] expenditure[] for ... services (other than services for state officers and employees)." Moreover, the State Administrative Manual explicitly confirms that "consultant and professional services" are among the categories included within the "operating expenses and equipment" budget item. (Cal. Dept. of Gen. Services, State Admin. Manual, § 6120.) Although the Attorney General contends that the term "services" ought to be limited to services for which the department has specifically contracted, nothing in the statutory language reflects any such contractual limitation. Indeed, inasmuch as the attorney fee award in this case rested in large part upon the fact that plaintiff's attorneys had provided a substantial economic benefit to the department (as well as to other state agencies), we believe that such fees naturally and reasonably fall within the "services" category.

Moreover, even if some question remained as to whether court-awarded fees could properly be considered expenditures for "services," in our view the concluding clause of the statutory definition, which expressly provides that funds in this budgetary category are available for "all other proper expenses," removes any doubt as to the general availability of such funds for the payment of court-awarded attorney fees. Since the Attorney General concedes that an appropriation need not specifically refer to the particular expenditure in question to

be available for its payment, the fact that the budget act recognizes the operating expense appropriation as a general "catchall" appropriation for "all other proper expenses" of the department directly supports the trial court's conclusion that such funds could properly be utilized for this purpose. (See, e.g., *Heron v. Riley* (1930) 209 Cal. 507, 515-516 [289 P. 160]; *Vandergrift v. Riley* (1934) 220 Cal. 340, 350-355 [30 P.2d 516].)

Our conclusion that the department's 1978 operating expense budget was generally available for payment of court-awarded attorney fees is confirmed by past administrative practice. Amici curiae, in both the Court of Appeal and this court, have presented documentary evidence, of which we take judicial notice, which indicates that on numerous occasions in past years various administrative agencies in California have routinely authorized the payment of court-awarded attorney fees out of their agency's current operating expense and equipment budget or similar general budgetary appropriations.[5] Although the Attorney General attempts to minimize the significance of this past administrative practice by arguing that the numerous expenditures in question may themselves have been improper, the Attorney General has provided nothing to demonstrate that prior to the institution of the present litigation, state officials had ever taken the position that attorney fee awards could not appropriately be charged against an agency's general operating expense appropriation.[6]

---

[5]The materials submitted by amici indicate the following:

(1) In 1976 and 1977, the Department of Benefit Payments paid fee awards in the cases of *Smock v. Carleson* (1975) 47 Cal.App.3d 960 [121 Cal.Rptr. 432] and McClean v. Obledo (Sac. Super. Ct. 1977), in the amounts of $1,000 and $19,000 respectively, out of the agency's operating expenses and equipment appropriation.

(2) In 1978, the Department of Health paid out $3,854.78 from its operating expense and equipment budget for attorney fees in the case of Steilberg v. Lackner (Alameda Super. Ct. No. 463759-8).

(3) In 1979, the Employment Development Department paid more than $39,000 from its "contingent fund" appropriation for attorney fees awarded in the case of *American Federation of Labor v. Employment Dev. Dept.* (1979) 88 Cal.App.3d 811 [152 Cal.Rptr. 193].

(4) In 1979, the Department of Justice paid $6,295 in attorney fees in the case of American Civil Liberties Union v. Younger. (Sac. Super. Ct. No. 262181.) The documents do not reveal which account the fee was charged to, but the department's budget contains no special line-item appropriation for court-ordered attorney fees.

(5) In 1978, the Department of Health paid $12,800 out of the general appropriation for the support of state hospitals for attorney fees awarded in *Fortney v. Simmons* (N.D.Cal.) No. C-75-2407 WHD.

[6]Indeed, there is strong indication to the contrary. For example, Welfare and Institutions Code section 10962 has provided since 1965 that welfare recipients who prevail in

Accordingly, we conclude that the operating expense appropriation at which the trial court's order in this case was directed was generally available for the payment of court-awarded attorney fees.[7]

4. ▆▆▆ *Having appropriated funds which are generally available for payment of court-awarded attorney fees, the Legislature could not validly exclude the particular attorney fee award in this case on the basis of its readjudication of the merits of the final court judgment.*

The Attorney General argues, however, that even if, as we have concluded, the agency's 1978-1979 operating expense appropriation was generally available for payment of court-awarded attorney fees, that appropriation was nonetheless unavailable for payment of the specific attorney fee at issue in this case. The Attorney General points out that section 15 of the 1978-1979 Budget Act provides that "[n]o appropriation made by this act . . . may be . . . used in any manner . . . to achieve any purpose which has been denied by any formal action of the Legislature." (Stats. 1978, ch. 359, § 15, p. 1006.) Because a legislative committee deleted an express line-item appropriation that had been proposed to pay the fee in question here, the Attorney General argues that under section 15 such legislative action must be interpreted as imposing a narrow limitation or restriction on the general availability of the agency's operating expense budget which precludes the use of such funds for the payment of this particular fee.

---

a judicial action arising from an administrative fair housing procedure are entitled to an award of attorney fees (Stats. 1965, ch. 1784, § 5, p. 3993), and over the years numerous cases have upheld attorney fee awards under this section. (See, e.g., *Trout v. Carleson* (1974) 37 Cal.App.3d 337 [112 Cal.Rptr. 282]; *Horn v. Swoap* (1974) 41 Cal.App.3d 375 [116 Cal.Rptr. 113].) Such fees were apparently routinely paid out of the Department of Social Services general budget despite the fact that the annual budget bills contained no special line-item appropriation for such attorney fees. This practice is evident from the report of the Legislative Analyst on the proposed 1979-1980 budget, which states that in the first six months of fiscal year 1978-1979, $7,000 in attorney fees were paid out by the department and notes that in the 1979-1980 budget a separate appropriation for such fees is "identified separately for the first time." (Rep. of Legis. Analyst, Analysis of the 1979-1980 Budget Bill, pp. 772-773.) Nothing in the report suggests that the department's past practice of paying such awards from a general appropriation category was in any way improper.

[7]In view of this conclusion, we have no occasion in the present case to determine whether court-awarded attorney fees should properly be considered an element of "costs" within the meaning of Code of Civil Procedure section 1028.

Although the Attorney General's argument may accurately portray the Legislature's intent to deny payment of this particular attorney fee award, the question remains whether such an exclusion of a particular award from the general appropriation provided in the agency's operating expense budget is valid. As we have already discussed, the *Levit* and *Lovett* decisions demonstrate that if the Legislature appends an invalid restriction to an appropriation measure, the restriction may properly be struck down and payment may be compelled without regard to the unlawful restriction.

In the present appeal, the Attorney General has not proffered any rationale to explain or justify the legislative exclusion of the particular attorney fee award at issue in this case. In a brief filed in this proceeding, the Attorney General candidly states that "[t]he state defendants do not presume to know or to understand why the Legislature on two occasions declined to appropriate money to pay the $25,000 award." If the Legislature had no legitimate reason for singling out this attorney fee award for disparate treatment, and arbitrarily withheld the benefits which the budget act affords to other similarly situated individuals, the appropriation restriction would, of course, violate elementary equal protection principles and for that reason alone would be invalid. (See, e.g., *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711-713 [139 Cal.Rptr. 620, 566 P.2d 254].)

Although the Attorney General offers no explanation and the Legislature itself has provided no formal rationale for its action, the discussion in the Legislative Analyst's report recommending the deletion of the proposed appropriation strongly suggests that the action of the legislative committee in question may well have been based simply upon the committee's own reassessment of the validity of plaintiff's underlying attorney fee claim. As we have seen (see fn. 1, *ante*), the Legislative Analyst's comments and recommendation on this measure took no note of the binding nature of the final court judgment but instead explicitly resurrected the very arguments concerning the validity of the attorney fee claim that had been raised and fully litigated by the state defendants in the judicial proceedings. Those arguments, of course, had been ultimately rejected by the final court judgment in *Mandel I*. In light of this legislative history, we must determine whether the Legislature may properly disregard the finality of a court judgment and take it upon itself to readjudicate on a case-by-case basis the merits of such a judgment.

We think that it is clear that the fundamental separation of powers doctrine embodied in article III, section 3 of the California Constitution (see fn. 4, *ante*) forbids any such legislative usurpation of traditional judicial authority. ■ Our Constitution assigns the resolution of such specific controversies to the judicial branch of government (Cal. Const., art. VI, § 1) and provides the Legislature with no authority to set itself above the judiciary by discarding the outcome or readjudicating the merits of particular judicial proceedings. As this court emphasized more than a century ago in the case of *Pryor* v. *Downey* (1875) 50 Cal. 388, 405: "[H]ad the Legislature gone one step further and, by special enactment . . . commanded the courts which had rendered a judgment in favor of a plaintiff . . . to set it aside and to enter a judgment for the defendant, such arbitrary attempt would, at once, have been recognized as an abuse not to be tolerated under our free constitution of government."

In this regard, Chief Justice Burger's comments in *United States* v. *Nixon* (1974) 418 U.S. 683, 704 [41 L.Ed.2d 1039, 1061-1062, 94 S.Ct. 3090], though voiced in response to a claim by the chief executive of an asserted right to exercise a central judicial function, are equally applicable in this case. Writing for a unanimous court, Chief Justice Burger stated: "Notwithstanding the deference each branch must accord the others, the 'judicial Power of the United States' vested in the federal courts by Art. III, § 1, of the Constitution can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto." Just as the courts may not reevaluate the wisdom or merits of statutes which have secured final passage by the Legislature, the Legislature enjoys no constitutional prerogative to disregard the authority of final court judgments resolving specific controversies within the judiciary's domain.

Two decisions from other jurisdictions—one rendered long ago and one decided within just the past few months—eloquently demonstrate that the Legislature lacks constitutional authority to readjudicate or set aside final court judgments on a case-by-case basis. In *Denny* v. *Mattoon* (1861) 84 Mass. (2 Allen) 361 [79 Am.Dec. 784], the Supreme Judicial Court of Massachusetts explained over 100 years ago that "[i]t is the exclusive province of courts of justice to apply established principles to cases within their jurisdiction, and to enforce their decisions by rendering judgments and executing them by suitable process. . . . [A]n act of the legislature cannot set aside or annul final judgments or de-

crees. This is the highest exercise of judicial authority.... To vest in the legislature the power to take them away, or to impair their effect on the rights of parties, would be to deprive the judiciary of its most essential prerogative.... It is obvious that such an exercise of [legislative] authority would lead to the entire destruction of the order and harmony of our system of government, and to a manifest infraction of one of its fundamental principles. Indeed, it is difficult to see how the legislature could more palpably invade the judicial department and effectively usurp its functions, than to pass statutes which should operate to set aside or annul judgments of courts in their nature final, and which would otherwise be conclusive on the rights of parties." (*Id.*, at pp. 378-379.)

More recently, in *Chadha* v. *Immigration and Naturalization Service* (9th Cir. 1980) 634 F.2d 408, the Ninth Circuit similarly explicated the separation of powers flaw inherent in any procedure which authorizes legislative readjudication of final judicial actions on a case-by-case basis. In *Chadha*, the court addressed the constitutionality of section 244(c)(2) of the federal Immigration and Naturalization Act, which authorized court review of an administrative decision to suspend deportation proceedings but then provided that a final judicial decision in a particular case could be nullified by congressional action.

The *Chadha* court concluded that this statutory scheme violated the separation of powers doctrine, explaining: "The duty of the Judiciary under this and numerous other statutory schemes is to determine ... whether the [administrative agency] has correctly applied the statute that establishes its authority.... By reason of the congressional disapproval device, nearly all judicial interpretations of the criteria in section 244 are rendered, in effect, impermissible advisory opinions. ... We think this is an interference with a central function of the Judiciary ...." (*Id.*, at p. 430.)

The *Chadha* court noted that under the statute in question "... [a]liens are no longer guaranteed the constraints of articulated reasons and *stare decisis* in the interpretation of the Immigration and Nationality Act. Adjudications they have obtained in the Judicial branch may be set aside for any reason, or no reason at all, so that judicial decisions may be for naught.... [¶] [As a consequence] [t]he Judiciary's duty to decide cases ... becomes subject to review by the Legislature, thus undermining the integrity of the third branch.... The Legislature thus disrupts the judicial system by retaining a selective power to override

individual adjudications, in lieu of changing standards prospectively by the usual, corrective device of a statutory amendment." (*Id.*, at p. 431.)

As the foregoing cases demonstrate, while the Legislature enjoys very broad governmental power under our constitutional framework, it does not possess the authority to review or to readjudicate final court judgments on a case-by-case basis. The recognition of such legislative authority would completely deprive court judgments of the respect and deference which the Constitution contemplates each branch of government will accord to final actions within the jurisdiction of a coequal branch, and would repose in the Legislature a combination of powers that the constitutional draftsmen specifically intended to forestall.[8]

Indeed, this fundamental separation of powers principle has particular force in instances, such as the present case, in which the Legislature attempts to void the effect of a court judgment which determines that the government itself is obligated to pay a sum of money to an individual. If the Legislature in such a case were empowered to reexamine the merits of litigation and to ignore a particular judgment whenever it so chose, the myriad safeguards of the judicial process would come to naught and one party to a lawsuit would in effect become both litigant and judge. In our view it is difficult to imagine a clearer example of legislative usurpation of judicial authority.

In fact, the United States Supreme Court recognized over a century ago that the separation of powers doctrine precludes the legislative branch from preempting the judicial role in just such a situation. In *United States* v. *Klein* (1872) 80 U.S. (13 Wall.) 128 [20 L.Ed. 519], the Supreme Court considered the validity of a proviso which Congress had appended to a clause in a general appropriations bill appropriating money for the payment of judgments of the court of claims against the United States. The proviso purported to require the Supreme Court to disallow some claims against the government that had already been approved by judicial decisions of the court of claims. Emphasizing that "[i]t is as much the duty of the government as of individuals to fulfill its obligations" and noting that the legislative measure before it would

---

[8]James Madison, in writing of the separation of powers doctrine in The Federalist Papers, quoted Montesquieu's warnings of the dangers posed by legislative exercise of judicial power: "'Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator* ....'" (Madison, The Federalist No. 47 (G.P. Putnam's Sons ed. 1908) at p. 302.)

effectively "allow[] one party to the controversy to decide it in its own favor," the court concluded that in enacting the measure "Congress has inadvertently passed the limit which separates the legislative from the judicial power." (80 U.S. at pp. 144, 146, 147 [20 L.Ed. at p. 525].) Accordingly, the court invalidated the challenged proviso and affirmed the previously adjudicated money judgments against the United States.

The Attorney General in the present case has cited no authority which casts doubt on the continued validity of the *Klein* decision (see generally Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic* (1953) 66 Harv.L.Rev. 1362, 1373 & fn. 39) or which suggests that the Legislature is constitutionally empowered to readjudicate on a case-by-case basis judgments rendered against the state. As we have explained, the recognition of any such legislative authority is, in our view, wholly foreign to the fundamental theory of the separation of powers doctrine.

■ Accordingly, insofar as the Legislature's exclusion of the attorney fee award in this case rested upon a legislative rejection of the merits of the final court judgment, we conclude that such exclusion is invalid. As we have already explained, the fact that the legislative action took the form of a restriction in an appropriations bill cannot save its validity. In *Levit*, the Legislature attempted, by means of a purported limitation on the use of appropriated funds, to exercise a power of textbook selection that the Constitution had delegated to another entity, and we struck down the restriction and ordered the Controller to pay moneys from the appropriated funds without regard to the invalid limitation. In *Lovett*, Congress attempted, again by a restriction appended to an appropriations bill, to exercise a power of inflicting individual punishment which it did not constitutionally possess, and the court invalidated the restriction and authorized the excluded individuals to obtain payment from the appropriated funds. Similarly, because the Legislature has no authority to readjudicate the merits of a final court judgment, we conclude that any restriction on the use of appropriated funds for payment of the particular fees in question here is invalid and thus does not bar the use of those funds for such payment.

We emphasize that our decision in this case in no way deprives the Legislature of its broad authority to control the state's fiscal affairs or to adopt appropriate measures to limit governmental expenditures. With respect to the matter of attorney fees, for example, the Legislature has at its disposal a wide variety of legitimate means by which to

restrict potential costs. Among other alternatives, the Legislature may if it chooses (1) establish a fixed or maximum hourly rate of recovery for attorney services (cf. Gov. Code, § 68093 (witness fees)), (2) prescribe a maximum "per-case" limit on attorney fee awards (cf. Bus. & Prof. Code, § 10474, subds. (a), (b), (c) (dollar limitations on recovery from Real Estate Fund)), (3) limit the kinds of cases in which attorney fees may properly be awarded (cf. Code Civ. Proc., § 1021.5 (delineating criteria for recovery of attorney fees on private attorney general theory)) or (4) appropriate a designated sum of money to an "attorney fee payment fund" and provide a reasonable basis for allocating such funds among eligible claimants should the designated sum prove insufficient to meet all fee awards. (Cf. Lab. Code, § 3716 (Uninsured Employers Fund).) Through such generally applicable statutory measures, the Legislature can fully protect the state's fiscal interest without either exceeding its constitutionally prescribed legislative function or drawing arbitrary, capricious and potentially invidious distinctions between similarly situated claimants.

As we have seen, however, in the instant case the Legislature did not adopt any such generally applicable mechanism for limiting state expenditures. Instead, it undertook to reject a particular attorney fee award apparently because of a legislative committee's disagreement with the merits of the final court judgment rendered in the case. As we have explained, because the Legislature had no authority to exercise such a classical judicial function, the resulting restriction on the use of funds for payment of this particular fee award is invalid.[9]

## 5. *Conclusion.*

As discussed above, the trial court in this case did not order the Legislature to pass an appropriations bill or to undertake any other

---

[9]We note that our conclusion in this regard is not inconsistent with the holdings of such cases as *Myers v. English, supra,* 9 Cal. 341, and *Westinghouse Electric Co. v. Chambers, supra,* 169 Cal. 131, which declare that the courts may not compel the Legislature to enact an appropriation measure and may not compel payment in the absence of any available appropriated funds. Properly interpreted, such decisions hold simply that by virtue of the separation of powers doctrine courts lack the power to order the Legislature to pass a prescribed legislative act. As *Levit* and *Lovett* demonstrate, however, those cases do not stand for the proposition that the Legislature may arrogate to itself functions which it may not constitutionally exercise simply by adopting restrictions in an appropriations bill. To the extent that language in *Myers* and *Westinghouse* can be read to suggest that the Legislature is not constrained by the separation of powers doctrine in exercising its appropriations power, such language conflicts with *Levit* and *Lovett* and must be disapproved.

legislative act, but simply directed an appropriate state official to pay a sum of money out of funds that the Legislature had already appropriated.[10] As we have seen, both the terms of the budget act and past administrative practice demonstrate that the funds in question were generally available for the payment of court-awarded attorney fees. Although the Legislature's deletion of a proposed appropriation for this particular award of attorney fees indicates that it did not intend the payment of this fee, and although the Legislature has broad authority to adopt general rules that apply without arbitrary discrimination to the recovery of attorney fees, the Legislature cannot pay some awards and not others solely because it readjudicates and redecides the merits of a case in which the court has reached a final judgment.

In sum, individual citizens who litigate claims against the government in our state courts are constitutionally entitled to expect that when the government loses, the Legislature will respect the final outcome of such litigation. The Legislature is not a supercourt that can pick and choose on a case-by-case basis which final judgments it will pay and which it will reject. If that kind of arbitrary conduct by the Legislature were to be the law, our system of justice would be subordinated to the popular vote of legislators, and our constitutional bedrock principle of separation of powers would become a shattered mass of scattered fragments.

The judgment is affirmed.

Mosk, J., Newman, J., Reynoso, J.,* and Grodin, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent. Chief Justice Harlan Fiske Stone once cautioned judges that "While unconstitutional exercise of power by the executive and legislative branches is subject to judicial restraint, the only check upon our own exercise of power is our own sense

---

[10]Thus, as the dissent itself is compelled to acknowledge, the order in this case does not threaten a direct confrontation with the Legislature and does not pose any possibility that members of the Legislature will be held in contempt for failing to perform a legislative act. The Controller, of course, is the state official to whom judicial orders directing the payment of public funds are traditionally addressed (see, e.g., *Jarvis* v. *Cory* (1980) 28 Cal.3d 562 [170 Cal.Rptr. 11, 620 P.2d 598]; *Olson* v. *Cory* (1980) 27 Cal.3d 532 [164 Cal.Rptr. 217, 609 P.2d 991]), and the past cases discussed above (e.g., *Levit*; *Lovett*) provide no basis for doubting that the Controller will comply with a final court order directing him to disregard an unconstitutional restriction in an appropriation bill.

*Assigned by the Chairperson of the Judicial Council.

of self-restraint." (Peter's Quotations (1977) p. 290.) The majority today rejects this sage observation and, trampling on the venerable doctrine of separation of powers, deliberately invades the exclusive authority of the Legislature in the appropriation of public funds.

Article III, section 3, of our California Constitution contains the following fundamental principle of democratic government: "The powers of state government are legislative, executive, and judicial. *Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.*" (Italics added.) Acknowledging this constitutional mandate, the majority concedes that "a court may neither directly compel the Legislature to appropriate funds nor order the payment of funds that have not been appropriated by the Legislature. [Citations.]" (*Ante*, p. 539) The problem is that although the majority bows to the principle, it does not comply with it.

The applicable law on the point has long been settled in California. One hundred twenty-three years ago we expressed the controlling rule in this manner: "[T]he power to collect and appropriate the revenue of the state is one peculiarly within the discretion of the Legislature. . . . *when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the body possessing the power of taxation.*" (*Myers* v. *English* (1858) 9 Cal. 341, 349, italics added.) This has been the clear and unchallenged California law ever since. Although it is aged, it is neither rusty nor obsolete because it is founded on *constitutional* principles. A recent expression of the same elementary proposition appears in *California State Employees Assn.* v. *Flournoy* (1973) 32 Cal.App.3d 219, 234 [108 Cal.Rptr. 251] which used these words: "Since appropriation of tax revenues is a legislative power (Cal. Const., art. IV, § 1) the authority to appropriate monies resides with the California State Legislature under the familiar doctrine of separation of governmental powers. . . ."

My colleagues of the majority insist, however, that because the plaintiff's claim for her attorney's fees has been reduced to a *judgment*, the interest of the judiciary in enforcing its judgments is invoked and the separation of powers principle is thereby rendered inapplicable. Not so. California law for years has been directly contrary. (*Myers* v. *English, supra*, 9 Cal. 341; *Westinghouse Electric Co.* v. *Chambers* (1915) 169 Cal. 131, 135 [145 P. 1025]; *California State Employees Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 108-109 [108 Cal.Rptr. 251].) The rendition of a judgment does not change the constitutional posture

of this case. We examined and flatly and unanimously rejected the precise argument of the majority over 65 years ago in *Westinghouse* in this fashion: "The general rule is well established that a *judgment* against the state ... merely liquidates and establishes the claim against the state, and that, *in the absence of an express statute so providing, such judgment cannot be collected* by execution against the state or its property, or by any of the ordinary processes of law provided for the enforcement of judgments; *it remains for the state, after such judgment, to provide for the payment thereof in such manner as it sees fit* ..., and the judgment creditor can obtain payment *in no other way* than that provided." (*Westinghouse Electric Co.* v. *Chambers, supra,* 169 Cal. at p. 135, italics added.)

The foregoing principles are not new (*Baggett* v. *Dunn* (1886) 69 Cal. 75 [10 P. 125]; *Marshall* v. *Dunn* (1886) 69 Cal. 223 [10 P. 399]), but they have current vitality. Thus in *Veterans of Foreign Wars* v. *State of California* (1974) 36 Cal.App.3d 688 [111 Cal.Rptr. 750], a plaintiff, otherwise qualified, was denied relief because plaintiff had failed to "specify a fund or appropriation from which a judgment may be paid. A judgment against the state, even when authorized by law, may be paid only out of appropriated funds." (P. 697.)

The case before us, of course, involves lawyer's fees for *privately retained* counsel. Five years ago we considered a case involving *court-appointed* counsel. (*Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565].) Even in such a situation we cautioned: "*The state also apparently assumes that if this court orders counsel appointed in certain cases, it will mandate that counsel be paid from public funds. We do not assert such power. If and how counsel will be compensated is for the Legislature to decide. Until that body determines that appointed counsel may be compensated from public funds in civil cases, attorneys must serve gratuitously* in accordance with their statutory duty..." (P. 920, fn. 6; see also *County of Fresno* v. *Superior Court* (1978) 82 Cal.App.3d 191 [146 Cal.Rptr. 880].)

The rule is plain. We ourselves have declared it and consistently followed it. Claimants against the State of California will be paid if, as, and when authorized by the Legislature, and that is equally so whether or not the claim is reduced to judgment. I am constrained to ask, at this point, why it is that the fundamental doctrine of stare decisis, as though swept by a cosmic wind, seems to have vanished without a trace into

some juridical black hole, beyond all sight and sound and memory? We should follow our own precedents.

The majority attempts to escape the application of the foregoing settled principles by conjuring a theory that the Legislature has *already* appropriated funds from which plaintiff's attorney's fees may be paid, this in the face of *two* admitted express legislative deletions of appropriations for the specific attorney's fees in question. The majority concedes that the Attorney General "may accurately portray the Legislature's intent to deny payment of this particular attorney fee award . . . ." (*Ante*, p. 546.) No matter. Combing through the general legislative budget the majority seizes on an appropriation contained in the 1978-1979 Budget Act (item 244(b)), denominated "operating expenses and equipment" of the Department of Health Services. This then becomes the escape hatch through which the majority attempts to ram through plaintiff's attorney's fees. With due respect, it won't work. The majority's result is unconstitutional for the several reasons which I now develop.

### 1. *"Operating Expenses"*

It is crystal clear that, having twice deleted from successive budgets specific authorization for these lawyer's fees, the Legislature did not then and does not now intend to authorize them. The majority acknowledges this but suggests that the Legislature nonetheless, *unintentionally*, I presume, authorized their payment. Apart from the dubious proposition that the state budget, carefully prepared and reviewed by the Budget Analyst, Department of Finance, Governor's Office, and legislative committee personnel contains *any* "unintentional" expenditures the majority's budgetary selection is a poor one. The 1978-1979 Budget Act (§ 26(b)) defines "operating expenses" as including "all expenditures for purchase of materials, supplies, equipment, services . . . and all other proper expenses." Reasonably read, the terms "services" and "proper expenses" must refer to those routine services voluntarily incurred by, or at the direction of, the department itself in its day-to-day operations. The lawyer's fees before us, on the other hand, are not such routine expenses. They represent an extraordinary, nonrecurring liability, involuntarily incurred and imposed upon the department by a court order and representing services directly rendered to an *adverse party*. These are not operational expenses of the Department of Health Services. They require a special appropriation rather than extraction from the general funds as a routine "operating expense." They were proposed as special appropriations and they were deleted as special

appropriations. This fact distinguishes *Vandegrift* v. *Riley* (1934) 220 Cal. 340 [30 P.2d 516], heavily relied upon by the majority. In *Vandegrift*, the court concluded that the Legislature clearly intended "emergency funds" to be used to supplement depleted operating costs. In our case the Legislature did *not* intend the *department's* "operating costs" to include the attorney's fees of Mandel. What, may I ask, happens to the routine departmental operations, if near the end of its budgetary period its appropriations become exhausted because of their depletion by the payment of an unplanned, unbudgeted lawyer's fee to plaintiff Mandel? This is very dangerous intermeddling through a judicial foraging raid aimed at rearranging and capriciously reducing departmental budget appropriations to replace monies that the Legislature in its wisdom and sole discretion has expressly deleted.

Moreover, my colleagues of the majority should be reminded that the lawyer's fees before us were awarded on a "substantial benefit" theory posited on an alleged *general* savings of public funds to the entire state and its taxpayers. The whole thesis of the award was that the benefits conferred by the *Mandel* decision are shared by *all* state agencies not merely the Department of Health Services. Why, then, does the majority, apparently looking over the entire state budget, appropriate the money by taking all of it out of *this* item ("operating expenses") budgeted for *this* particular entity (Department of Health Services)? The award, representing services allegedly benefitting the state *as a whole*, should be paid, if at all, from a specific appropriation set aside for that specific purpose, which of course, is exactly what was proposed to and rejected by the Legislature originally.

### 2. *Specific Appropriation Deleted*

Even were it agreed that the term "operating expenses" was sufficiently broad to include attorney's fees of the kind herein presented, the appropriate legislative committee expressly *deleted* the proposed appropriation from the 1978-1979 Budget Act. What was the effect of such a deletion by the people's elected representatives? Section 15 provides the answer in these words: "*No appropriation made by this act . . . may be . . . used in any manner . . . to achieve any purpose which has been denied by any formal action of the Legislature.*" (Assem. Bill No. 2190, amended June 28, 1978, ch. 359, p. 242.) It is apparently conceded that the deletion of the item from the proposed budget constituted such "formal action."

The enormity of today's intrusion into legislative affairs is thus revealed. Not only does the majority disregard the Legislature's deletion of the proposed appropriation, but it also unilaterally restores this appropriation by choosing the particular department the budget of which is to be reduced, even selecting the particular item in that budget from which it chooses to direct the payment. Moreover, and this is perhaps the majority's most wondrous contrivance, it does what the Legislature itself cannot do. The majority strikes section 15 from the Budget Act by using an "appropriation made [operating expenses of the Department of Health Services] to achieve a purpose which has been denied by ... formal action of the Legislature" (payment of the lawyer's fees). This exceeds even the Legislature's own appropriation powers.

I suggest with due deference to my colleagues, that the majority has *grossly* interfered with a matter which is constitutionally and exclusively placed in legislative hands. It accomplishes this by making a shambles of the separation of powers doctrine, constitutionally ordained, and by wholesale rewriting of several sections of the budget act, all without benefit of authority and unburdened, of course, by the necessity for any budgetary hearing. The majority thereby constitutes itself the highest legislative body in the state.

The majority's holding is as dangerous as it is unprecedented. It will allow courts to compel appropriations, contrary to the best judgment of the Legislature, by the simple device of rearranging the operating or general funds of any state agency. The lawyer's fees before us are $25,000, but the disruptive principle is thereby set for the next case which may involve considerably more. The historic general rule which prevents either the courts or the executive from ordering appropriations is thus entirely swallowed up in the majority's newly invented exception when a court finds that funds have been "already appropriated" (*ante*, pp. 540, 542) and even though the fictitious "appropriation," if any, was unintended and inadvertent.

Hiding behind this device, the majority thus avoids a direct, sad, and wholly unnecessary confrontation with the Legislature itself. The stratagem used by the majority is to pick its way through the existing legislative appropriations in *some* budget in *some* department, and settle on one of the "operating expenses and equipment" items. The majority's dispositive order therefore is directed at the Controller rather than the Legislature. To the Legislature's complaint that it considered but flatly refused to make the specific appropriation, the majority answers "Too

late. You didn't know it but you've already made it. Moreover, you can't reconsider it." The majority reasons that the Legislature unintentionally appropriated as "operating expenses and equipment" what it intentionally rejected as "plaintiff's attorney's fees." The inevitable result of the majority's technique is that lurking in every succeeding budget will be a "free fund," wholly exempt from legislative control, past or present, but thereafter available for the payment of any rejected appropriation requests chosen by the court's majority. This case calls for frankness not finesse. We should openly and honestly acknowledge that the Legislature not only did not *intend* to appropriate monies for payment of the lawyer's fees, but it did not *in fact* appropriate such monies.

Moreover, the basis for the majority's rationale is very dubious. It relies primarily on *United States* v. *Lovett* (1946) 328 U.S. 303 [90 L.Ed. 1252, 66 S.Ct. 1073], and *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441 [343 P.2d 8]. Neither case is relevant, because neither involved a court-ordered appropriation from an agency's general operating funds. In *Lovett*, the United States Supreme Court invalidated as a bill of attainder an attempted limitation upon the use of funds *already appropriated* for salaries of federal employees. In *Levit*, we struck down as discriminatory a similar restriction upon an *existing appropriation* for public school textbooks. Implicit in each of these decisions was the determination that the disputed payments properly could be ordered from appropriations *already made for the same general purpose* (i.e., for payment of federal salaries and purchase of public school textbooks). Obviously, neither case supports the majority's novel theory that a court can breathe new life into a deleted, rejected appropriation thus reviving it by resort to a defendant public agency's general operating fund which presumably has been appropriated for other purposes.

Furthermore, both *Lovett* and *Levit* involved payment restrictions which were patently discriminatory and unconstitutional. No such constitutional defect appears on the face of the record before us. We have no basis whatever for concluding that the Legislature acted with an improper motive or discriminatory intent in declining to appropriate funds for the payment of the extraordinary lawyer's fee award at issue herein. For reasons satisfactory to itself the Legislature looked at this claim for attorney fees and decided not to appropriate money for it. It was not required to do so. This is precisely the kind of appropriation decision which the Legislature, *and the Legislature alone*, is fully empowered to make under our California Constitution.

Several years ago we held that "The separation of powers doctrine articulates a basic philosophy of our constitutional system of government; it establishes a system of checks and balances to protect any one branch against the overreaching of any other branch. (See Cal. Const., arts. IV, V and VI; The Federalist, Nos. 47, 48 (1788).)" (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 141 [93 Cal.Rptr. 234, 481 P.2d 242].) In my view, today's decision gravely impairs this vital and fundamental constitutional safeguard.

I would reverse the judgment.

**BIRD, C. J.,** Dissenting.—I write separately because I join in part the reasoning, if not the rhetoric, of my dissenting colleague.

The facts are clear. The Legislature has never appropriated funds to pay for the attorney fees requested in this case. In fact, the Legislature has specifically refused to appropriate funds for this purpose.

I am sympathetic with the majority's desire to see this legally valid judgment honored. However, I am disturbed by the majority's avoidance of the real issues by finding that the legal fees were authorized by the Legislature. All the objective facts point to a contrary conclusion. Creating a fiction and ignoring clear legislative intent will only lead in the long run to an emotional confrontation between this court and the Legislature.

Perhaps discretion is the better part of valor, but this court is only postponing the resolution of this thorny constitutional problem for another day. The majority skirt the issue of a court's power to enforce legal judgments which the Legislature refuses to pay. I suspect this problem will not become any more tractable with the passage of time. I would have preferred this court to grapple with this complicated issue directly by confronting the constitutional clash between the powers of the judicial and legislative branches of our government. As life often teaches us, avoidance will not make the problem disappear, for cases such as *Serrano* v. *Priest* (2 Civ. 58971, app. pending) lurk in the shadows.

Two questions are raised by this appeal. May the state with impunity ignore or refuse to pay its valid legal debts or judgments? Does the

doctrine of separation of governmental powers render the judiciary impotent to enforce valid judgments against the state when the Legislature refuses, without legal justification, to appropriate money for that specific purpose?

Although I agree with Justice Richardson that the Legislature did not appropriate any monies to pay these legal fees, I feel constrained to voice a reservation concerning his absolutist position. What are the powers of this court when the Legislature decides to use the power of the purse to deliberately discriminate against one sector of the community in violation of the Constitution? Under the dissent's sweeping doctrine, the courts would be powerless to remedy that situation.[1] Certainly, that cannot be what our forefathers intended when they developed our tripartite system of government with its separation of judicial, legislative, and executive functions.

Comity is an important concept in the peaceful operations of a democratic government. Unless each branch of government has respect for the legal actions of the other branches, the democratic process will falter and eventually fail.

The Legislature has refused for no apparent reason to recognize the legal obligation the state owes these attorneys for their work. Just as any citizen of this state must pay his or her legal debts, the State of California should pay its legal debts. No citizen to whom the state owes money should have to go to the Legislature time and time again to obtain some action and, when rebuffed, be forced to turn to the courts for relief.

If the State of California expects its citizens to pay their obligations to the state in taxes, which form the basis for the monies the Legislature appropriates, can it blithely ignore its own obligations? I think not.

## I.

The separation of powers doctrine is embodied in the California Constitution in article III, section 3. "The powers of state government are

---

[1]Justice Richardson does seem to equivocate when he admits that the courts may have the power to remedy a situation in which the Legislature acted with "an improper motive" or "discriminatory intent." (*Ante*, at p. 558 (dis. opn. of Richardson, J.). Further, his citation with approval of *United States* v. *Lovett* (1946) 328 U.S. 303 [90 L.Ed. 1252, 66 S.Ct. 1073] and *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441 [343 P.2d 8] indicates he recognizes some exceptions to his otherwise inflexible rule.

legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

The founders of our republic divided the tasks of governing into three parts to avoid "[t]he accumulation of all powers legislative, executive and judiciary in the same hands . . . ." (Madison, The Federalist No. 47 (1788).) Such an accumulation of power without divided responsibility was denominated by James Madison as "the very definition of tyranny." (*Ibid.*) Justice Jackson saw that the separation of powers doctrine was intended to achieve unity with diversity. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." (*Youngstown Co.* v. *Sawyer* (1952) 343 U.S. 579, 635 [96 L.Ed. 1153, 1199, 72 S.Ct. 863, 26 A.L.R.2d 1378] (conc. opn. of Jackson, J.).)

The "separateness and interdependence" of the branches lead to inevitable tensions which must be resolved within the Constitution's framework. (See, e.g., McGowan, *Congress, Court and Control of Delegated Power* (1977) 77 Colum.L.Rev. 1119, 1119-1120; Levi, *Some Aspects of Separation of Powers* (1976) 76 Colum.L.Rev. 371, 382.) The complexity of modern government has made it all the more difficult to draw clear lines between executive, legislative, and judicial tasks. Yet, the Constitution requires that this court prevent one branch from exercising another branch's powers.

It cannot be denied that the judiciary has inherent equitable power to award attorney fees even in the absence of statutory authority. (E.g., *Sprague* v. *Ticonic Bank* (1939) 307 U.S. 161, 166 [83 L.Ed. 1184, 1186-1187, 59 S.Ct. 777]; *Newman* v. *Piggie Park Enterprises* (1968) 390 U.S. 400, 402, fn. 4 [19 L.Ed.2d 1263, 1266, 88 S.Ct. 964]; *Mills* v. *Electric Auto-Lite* (1970) 396 U.S. 375, 389-397 [24 L.Ed.2d 593, 604-609, 90 S.Ct. 616]; *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240, 257-259 [44 L.Ed.2d 141, 153-154, 95 S.Ct. 1612]; *Hutto* v. *Finney* (1978) 437 U.S. 678, 689 [57 L.Ed.2d 522, 533, 98 S.Ct. 2565]. See also Nussbaum, *Attorney's Fees in Public Interest Litigation* (1973) 48 N.Y.U.L.Rev. 301, 323-331, 332.)

This common law rule was applied in earlier litigation by the trial court and affirmed on appeal in *Mandel* v. *Hodges* (1976) 54 Cal.

App.3d 596, 619-624 [127 Cal.Rptr. 244, 90 A.L.R.3d 728] (hg. den., Mar. 18, 1976). All issues relating to the power of the judiciary in awarding these fees were argued and conclusively decided. Even the Attorney General had to concede in this proceeding the validity of that trial court judgment. Ironically, the Legislature also recognized the propriety of similar fee awards when it passed the public interest attorney fees statute in 1977. (See Code Civ. Proc., § 1021.5.)

The decision to award fees in a specific case is a uniquely judicial determination which involves conducting a hearing, taking evidence, weighing the equities, and applying the relevant legal principles to the facts presented. It is evident that the trial court did not intrude on the Legislature's prerogatives when it awarded fees in the underlying action.

The question remains whether the Legislature may constitutionally shield the state from liability by refusing to appropriate funds to pay for a valid legal judgment without any legitimate reason. The Attorney General is in the unenviable position of attempting to defend this legislative action on the sole basis that the power of the purse is virtually absolute. He concedes that the Legislature may not invidiously discriminate in funding. Otherwise, he claims that the appropriation power gives unlimited discretion to the legislative branch. A close examination of this assertion establishes its fallacy.

The Legislature's power of the purse is extensive but not without limits. For example, the appropriation power does not encompass the right to grant public benefits conditioned on the waiver of a recipient's constitutional rights. (E.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779]; *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal. Rptr. 623, 425 P.2d 223].) Similarly, the appropriation power does not give the Legislature the right to refuse to fund a coequal branch of government. "A court set up by the Constitution has within it the power of self-preservation, indeed, the power to remove all obstructions to its successful and convenient operation. This arises from the fact that it is part of and belongs to one of the three independent departments set up by the Constitution ... [t]here is this qualification thereof, ... the legislature may at all times aid the courts and may even regulate their operation so long as their efficiency is not thereby impaired." (*Millholen* v. *Riley* (1930) 211 Cal. 29, 33-34 [293 P. 69]. But see *Myers* v. *English* (1858) 9 Cal. 341, 349.)

Just as the power of appropriation does not provide the Legislature with tools for exacting a waiver of constitutional rights or denying funds to a coequal branch of government, that power cannot be said to support any other violation of a constitutional mandate. The power of the purse may be comprehensive but it is certainly not talismanic. It cannot transform unconstitutional actions into lawful ones.

Initially, the question that must be answered is whether the Legislature has the constitutional power under the separation of powers doctrine to refuse to appropriate funds to pay for a legitimate legal judgment without any valid reason. This court has articulated a standard for assessing whether the Legislature has stepped over the line and exercised the power of a coequal branch. "The sum total of this matter is that the legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions." (*Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 444 [281 P. 1018, 66 A.L.R. 1507].)

There is no doubt that under our system of government the adjudicative function belongs with the judiciary.[2] The Legislature cannot substitute its judgment for that of a court where an adjudication is involved. (See *United States* v. *Klein* (1872) 80 U.S. (13 Wall.) 128, 145-148 [20 L.Ed. 519, 525-526]; *Denny* v. *Mattoon* (1861) 84 Mass. (2 Allen) 361, 377-380 [79 Am.Dec. 784]; *Chadha* v. *Immigration and Naturalization Service* (9th Cir. 1980) 634 F.2d 408, 420-436.) Such legislative adjudication violates the very essence of the principle of separation of powers.

---

[2]The adjudicatory power has been given to the courts in our tripartite system. My dissenting opinion in *People* v. *Tanner* discusses the contours of that power in a criminal law setting. (See *People* v. *Tanner* (1979) 24 Cal.3d 514, 569-578 [156 Cal.Rptr. 450, 596 P.2d 328] (conc. and dis. opn. of Bird, C. J.).) There, although a judge did not have the power to place a defendant on probation in defiance of a legislative prohibition, the Legislature could not constitutionally prohibit a court from striking a penalty enhancement factor. To do so would have violated the separation of powers clause of the Constitution. Once the court exercised its adjudicatory power and struck the enhancement factor, the defendant could be placed on probation if the resulting "unenhanced" offense was one for which the Legislature had permitted probation. Thus, although the Legislature had forbidden probation for robbery-with-a-use clause, it had *not* forbidden probation for straight robbery.

Therefore, once the judge struck the use clause—which he was constitutionally entitled to do since it was an adjudicatory function—he could then treat the defendant as a person convicted of a straight robbery, a crime for which the Legislature permitted probation.

When the Legislature refused to pay this valid legal judgment, it necessarily substituted its determination as to the legality of the judgment for that of the judiciary, implying that it would have adjudicated the case differently. In doing so, the Legislature was exercising judicial power. As this court recognized in 1855, "[t]he Legislature cannot exercise judicial functions, and therefore cannot except one case, or one party, from the operation of a general rule of law, either as to right or remedy." (*Guy* v. *Hermance* (1855) 5 Cal. 73, 74.)

It is clear that the Legislature may change the common law prospectively, but it may not reverse a judgment in a case already decided. (*Pryor* v. *Downey* (1875) 50 Cal. 388, 408; *Hodges* v. *Snyder* (1923) 261 U.S. 600, 603 [67 L.Ed. 819, 821-822, 43 S.Ct. 435]; *Chadha* v. *Immigration and Naturalization Service, supra*, 634 F.2d at p. 431.) In addition, the Legislature may regulate the procedure to be used and the notice required for payment of claims against the state. It may choose the method of payment and the proof required. These functions are legislative since they apply to *all* claims against the state nondiscriminatorily.

Similarly, if the state faced a severe fiscal crisis, the Legislature might enact nondiscriminatory limits upon its liability to judgment creditors. This would not offend the separation of powers clause because the Legislature would not be selectively choosing among the valid judgments, and, therefore, would not be reweighing the judicial decision on the merits. (See maj. opn., *ante*, at pp. 550-552.)

The real problem here involves the proper remedy for the holders of this valid legal judgment for attorney fees. The dissent is wrong when it concludes that there is no remedy available to these judgment creditors. Chief Justice John Marshall set down the rule of law in 1803 in *Marbury* v. *Madison*. "In the 3d vol. of his Commentaries (p. 23), Blackstone states . . . 'In all other cases, . . . it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded.' And afterwards (p. 109, of the same vol.), he says, '. . . for it is a settled and invariable principle . . . that every right, when withheld, must have a remedy, and every injury its proper redress.' [¶] The government of the United States has been emphatically termed a government of laws, and not of men [or women]. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." (*Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 87, 103 [2 L.Ed. 60, 69].)

In the face of the Legislature's unjustified refusal to pay this ·valid judgment, the state should be treated like any other intransigent civil litigant.

The power to enforce a judgment by execution and other means is an essentially judicial power. "An execution is a judicial writ issuing from the court where the judgment is rendered, directed to an officer thereof, and running against the body or goods of a party, by which the judgment of the court is enforced. It has also been defined as the end of the law; ... the ... fruit of the law; the act of carrying into effect the judgment or decree of a court; ... the embodied power of the court, in the shape of a command to a ministerial officer, respecting the rights of the parties to the judgment, and imposing on the officer certain duties and liabilities prescribed by law." (33 C.J.S. (1942) Executions, § 1, p. 133, fns. omitted.) The rules regarding execution of judgments are codified in the Code of Civil Procedure sections 681-724e. The writ of execution is a purely judicial tool. (See Code Civ. Proc., § 682.)[3]

The old common law rule exempting state property from execution of judgments was set down in *Westinghouse Electric Co. v. Chambers* (1915) 169 Cal. 131, 135 [145 P. 1025]: "a judgment against the state ... merely liquidates and establishes the claim against the state, and ... such judgment cannot be collected by execution against the state or its property ...; it remains for the state, after such judgment, to provide for the payment thereof in such manner as it sees fit, or to refuse to do so at its pleasure ...." This rule was later codified in Government Code section 965.5, subdivision (b).[4]

This exception was based on the concept of governmental immunity which exempted the state from liability and suit by its citizens. However, the doctrine of sovereign immunity was substantially repudiated by this court in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211

---

[3]A judgment is enforceable by writ of execution if the judgment is: (1) final and unconditional; (2) sufficiently certain to constitute an enforceable personal money judgment; and (3) a valid and continuing obligation. (5 Witkin, Cal. Procedure (1971) Enforcement of Judgment, § 5, p. 3391.) A writ of execution may be issued to "[t]he party in whose favor judgment is given" any time within 10 years of the entry of judgment. (Code Civ. Proc., § 681.) This writ, issued by a judge, directs a sheriff or other officer to satisfy the judgment out of the personal or real property of the debtor. (Code Civ. Proc., § 682.)

[4]Section 965.5, subdivision (b) states: "A judgment for the payment of money against the state or a state agency is not enforceable under Title 9 (commencing with Section 681) of Part 2 of the Code of Civil Procedure [Execution of Judgments] but is enforceable under this chapter."

[11 Cal.Rptr. 89, 359 P.2d 457] as "mistaken and unjust." (*Id.*, at p. 213.) As Chief Justice Traynor (then Associate Justice) ably argued, "[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." (*Id.*, at p. 216, citations omitted.)

Chief Justice Traynor explained the inherent power of the court to abrogate the doctrine of state immunity. "The doctrine of governmental immunity was originally court made .... [¶] The state has also enacted various statutes waiving substantive immunity in certain areas... [¶] ... Defendant would have us say that because the Legislature has removed governmental immunity in these areas [the court is] powerless to remove it in others. We read the statutes as meaning only what they say: that in the areas indicated there shall be no governmental immunity. *They leave to the court whether it should adhere to its own rule of immunity in other areas.*" (*Id.*, at pp. 218-219, italics added.)[5] Just as the *Muskopf* court had the power to abrogate the court-made doctrine of governmental immunity for torts, this court has the constitutional authority to overrule the court-made execution exemption articulated in *Westinghouse Electric Co.* v. *Chambers, supra*, 169 Cal. 131, and to invalidate on constitutional grounds its subsequent codification. Insofar as it permits legislative readjudication of final judgments, the execution exemption violates the separation of powers doctrine. The right to sue becomes worthless if, once liability of the state is legally established, there is no remedy. The execution exemption is as outmoded as the tort immunity abolished in *Muskopf.*

As this court has unanimously underscored, "in a society such as ours, which places such great value on the dignity of the individual and views the government as an instrument to secure individual rights, the doctrine of sovereign immunity must be deemed suspect." (*Hall* v. *University of Nevada* (1972) 8 Cal.3d 522, 526 [105 Cal.Rptr. 355, 503 P.2d 1363, 81 A.L.R.3d 1234], citations omitted.)

*Muskopf* and *Hall* judicially abrogated governmental tort immunity. The government has never been immune from suits for unconstitutional

---

[5]The court also disposed of the defendant's claim that the immunity doctrine was constitutionally mandated. The provision now found in article III, section 5 (formerly art. XX, § 6) of the California Constitution states: "Suits may be brought against the state in such manner and in such courts as shall be directed by law." This section was deemed a waiver of immunity rather than an assertion of it. (*Muskopf, supra*, 55 Cal.2d at p. 217.)

acts since express prohibitions within the Constitution act as fundamental limits on state power. (Mikva & Hertz, *Impoundment of Funds—the Courts, the Congress and the President: A Constitutional Triangle* (1974) 69 Nw.U.L.Rev. 335, 356; Abernathy, *Sovereign Immunity In A Constitutional Government: The Federal Employment Discrimination Cases* (1975) 10 Harv.Civ. Rights-Civ.Lib.L.Rev. 322, 331 [hereinafter. Abernathy].) Such prohibitions have been held to be self-executing and to contain within them consent to be sued. (See *Rose* v. *State of California* (1942) 19 Cal.2d 713, 720 [123 P.2d 505].)

The plaintiffs in this case originally sued under the freedom of religion clauses of the federal and state Constitutions. (*Mandel* v. *Hodges, supra*, 54 Cal.App.3d at pp. 610-619.) The state was not entitled to immunity from suit under those provisions. If immunity from suit for the substantive constitutional violations did not exist, why should the remedy for those violations be barred by another tenet of the state immunity principle? Once it has been established that the state does not have immunity from legal suit and the resulting liability, on what conceivable basis may the state be completely exempted from fulfilling its legal obligation to pay that judgment?

The execution provisions of the Code of Civil Procedure protect judgment creditors against unwilling but solvent debtors. The state in this case is just such a debtor.[6] The Legislature cannot build a barrier around the state's assets by requiring that judgment creditors undergo a second trial on the merits before the Legislature. Further, there is no legislative power to annul a final legal judgment.

The only rational reason advanced in recent years for the state exemption to the general rules of liability is the possible concern that if this power were not present, the state would lose control over state property. (Block, *Suits Against Governmental Officers And The Sovereign Immunity Doctrine* (1946) 59 Harv.L.Rev. 1060, 1061-1062 [hereinafter Block]. See Comment, *Sovereign Immunity: A Modern*

---

[6]It has been noted that the fact that a given judgment may be impossible to execute is one of the "notorious incidents" of litigation. (*F. H. A.* v. *Burr* (1940) 309 U.S. 242, 251 [84 L.Ed. 724, 732, 60 S.Ct. 488].) This comment recognizes that not all debtors have assets which may be reached. However, the state is not insolvent or judgment-proof. The state, as enforcer of the law, should set an example for its citizens because "[i]t is as much the duty of the government as of individuals to fulfil its obligations." (*United States* v. *Klein, supra*, 80 U.S. (13 Wall.) at p. 144 [20 L.Ed. at p. 525].) The state should be held to at least the same standards as the citizenry.

*Rationale In Light of the 1976 Amendments to the Administrative Procedure Act*, 1981 Duke L.J. 116, 119-120.) However, this concern was addressed by the Legislature when it enacted statutes which require claimants to follow certain procedures in order to obtain payment of their judgments. (Gov. Code, §§ 965-965.9.) The entry of judgment as well as the procedures for payment give the state ample notice for fiscal planning purposes. A rule which permitted execution against state monies would not interfere with the state's control over its other property.[7]

Moreover, "[i]t does not seem logical to allow a government to claim that its functions are being unduly interfered with when the exercise of the function complained of is ... unconstitutional ...." (Block, *supra*, 59 Harv.L.Rev. at p. 1062. See also Abernathy, *supra*, 10 Harv.Civ. Rights-Civ.Lib.L.Rev. at p. 333.) Therefore, the state should not be heard to complain of an interference with its functions when the cause of the interference is the unconstitutional legislative relitigation of a final court judgment.

The execution exemption permits the Legislature to unconstitutionally veto or annul a court's final judgment against the state. In *Caminetti v. Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344 [139 P.2d 908], Chief Justice Gibson articulated the legal problems with such a law. "Ordinarily the judgment of a court may not be modified or altered by legislative action [citations] because a judgment is a form of contract protected by the contract and due process clauses of the state and federal Constitutions. [Citations.] A further reason has been advanced to the effect that such legislation is an infringement upon the functions of the judicial branch of the government. [Citations.]" (*Id.*, at p. 363.)

The Massachusetts Supreme Judicial Court recognized that the same reasoning applies to a court's power to execute a judgment. "It is the exclusive province of courts of justice to apply established principles to cases within their jurisdiction, and to enforce their decisions by rendering judgments and *executing them by suitable process.* The legislature [has] no power to interfere with this jurisdiction in such manner as to change the decision of cases pending before courts, or to impair or set aside their judgments, or take cases out of the settled course of judicial proceeding." (*Denny* v. *Mattoon, supra*, 84 Mass. (2 Allen) at p. 378, italics added.)

---

[7]And see *post*, at page 571, footnote 10.

The separation of powers principle has often been held to prohibit the Legislature from subsequently invalidating a final court judgment. (*Pryor* v. *Downey, supra,* 50 Cal. 388, 398; *Lincoln* v. *Alexander* (1877) 52 Cal. 482, 487; *United States* v. *Klein, supra,* 80 U.S. (13 Wall.) 128; *Hodges* v. *Snyder, supra,* 261 U.S. 600.) The principle of finality of court judgments could not exist without this legal precedent. (See *United States* v. *Klein, supra,* 80 U.S. (13 Wall.) at p. 144 [20 L.Ed. at pp. 524-525].) Further, this court has unanimously recognized that requirements of legislative or executive consent to judicial actions also violate the separation of powers doctrine. (*People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]; *Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140]; *People* v. *Navarro* (1972) 7 Cal.3d 248 [102 Cal.Rptr. 137, 497 P.2d 481]. See also *People* v. *Superior Court* (*On Tai Ho*) (1974) 11 Cal.3d 59 [113 Cal.Rptr. 21, 520 P.2d 405]; *Scott* v. *Municipal Court* (1974) 11 Cal.3d 799 [114 Cal.Rptr. 600, 523 P.2d 640].)

The rule exempting state property from execution where the Legislature relitigates a final judgment essentially grants the legislative branch a right of review and veto over final judgments against the state. This veto power impairs the judicial function in the extreme by invalidating judicial decisions on a case-by-case basis. As a result, a court's decisions are rendered advisory at best. "The power to act under our system of government means the power of an independent court to exercise its judicial discretion, not to servilely wait on the pleasure of [another branch]." (*People* v. *Sidener* (1962) 58 Cal.2d 645, 654 [25 Cal.Rptr. 697, 375 P.2d 641] (dis. opn. of Schauer, J.), overruled in *People* v. *Tenorio, supra,* 3 Cal.3d 89, 95.) Therefore, insofar as the execution exemption for state property gives the Legislature a right to review and annul final judicial judgments, without legal justification, it violates the separation of powers clause.

The exemption of state property from the rules of execution creates a number of anomalies worthy of note. First and most obvious is the case of the indebted taxpayer. The state is given the power under our system of government to attach and execute against taxpayers' property when a debt is owed the state. (See Rev. & Tax. Code, § 18865.) However, this same citizen with a judgment against the state is rendered remediless by an arbitrary refusal by the Legislature to offset the judgment or appropriate funds to pay it. (See Gov. Code, § 965.5.) Thus, the state, which promulgates the laws, is not obliged to follow the rules it makes for its own citizens.

In the area of governmental torts, the Legislature itself has proclaimed that the government may be held liable for its own torts. (Gov. Code, § 810 et seq.) Yet, the execution exemption permits the Legislature to thwart the outcome of the very suits the government has agreed are valid and which it has invited to be filed. Surely, the Legislature should not be allowed to abrogate sovereign immunity on the one hand and to refuse, without reason, to pay any or all of the resulting judgments on the other.

The present case illustrates the way in which the execution exemption may force the citizens of this state into the federal courts to remedy unconstitutional acts of state officials. If Ms. Mandel had filed a similar lawsuit in federal court claiming a violation of her civil rights (see 42 U.S.C. § 1983)[8] and won the precise judgment, that judgment could have been executed against state property. Under the rule of *La Raza Unida* v. *Volpe* (N.D.Cal. 1972) 57 F.R.D. 94, 98, attorney fees could have been awarded even before the enactment of the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988). These fees are not barred by state sovereign immunity statutes. (*Hutto* v. *Finney, supra*, 437 U.S. 678, 689-693 [57 L.Ed.2d 522, 533-536].) Further, a district court may order the issuance of a warrant and payment from the state treasury despite a state statute barring execution against state property and despite the Legislature's refusal to appropriate funds. (*Gates* v. *Collier* (5th Cir. 1980) 616 F.2d 1268.)

A district court's issuance of a writ directing the United States Marshal to seize state property to satisfy a valid legal judgment has been upheld on appeal notwithstanding a state constitutional rule exempting state property from execution. (*Gary W.* v. *State of La.* (5th Cir. 1980) 622 F.2d 804, cert. den., — U.S. — [68 L.Ed.2d 193, 101 S.Ct. 1695].) Thus, if Ms. Mandel had obtained the same judgment in a federal rather than a state court, she would not face her present predicament. Instead of encouraging California residents to use the state court system to remedy unconstitutional actions by state officials, the execution exemption creates a disparity which makes the state courts ineffectual forums for such suits.[9]

---

[8] Federal courts do have stricter standing requirements for taxpayer suits than do the state courts. Thus, this *substantive* claim may not have alleged sufficient injury to warrant federal jurisdiction. (See *Flast v. Cohen* (1968) 392 U.S. 83, 102-103 [20 L.Ed.2d 947, 963, 88 S.Ct. 1942].) Nevertheless, the hypothetical is still valid insofar as constitutional claims against the state do meet federal jurisdictional standards.

[9] Professor Wolcher has suggested that litigants seeking to vindicate federal civil rights should increasingly file suit in state courts. (Wolcher, *Sovereign Immunity and*

When the Legislature attempts to exercise judicial authority by refusing to pay a valid legal judgment, without justification, the courts of this state have no alternative. They must enforce the judgment by issuing a writ of execution against the assets of the state.[10] (Cf. *F. H. A.* v. *Burr, supra,* 309 U.S. at p. 250 [84 L.Ed. at p. 731].) However, this power is not unlimited and should be exercised only when all other means of obtaining the state's voluntary compliance fail.

The issuance of a writ of execution is an inherent judicial power. "The award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties, unless Congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this Court ...." (*Gordon* v. *United States* (1865) 69 U.S. (2 Wall.) 561 [17 L.Ed. 921] (appen. by Taney, C. J., at 117 U.S. 697, 702 [76 L.Ed. 1347, 1350]). See also *F. H. A.* v. *Burr, supra,* 309 U.S. at p. 250 [84 L.Ed. at p. 731].)

## II.

The Legislature has never appropriated funds to pay for the attorney fees requested in this case. The Legislature has twice specifically refused to appropriate funds for this purpose despite requests by the Governor's office and the plaintiff. As the dissent points out, it is impermissible for courts to intrude on the legislative power of the purse by finding an implied grant of funds despite an unmistakable intent to do just the opposite. Therefore, unlike the majority, I would not affirm the trial court's order.

---

the Supremacy Clause: Damages Against States in Their Own Courts for Constitutional Violations (1981) 69 Cal.L.Rev. 189, 314-316.) In the event that such suits are filed in state courts, fee awards granted under the Civil Rights Attorney's Fees Awards Act are likely to increase the number of cases to which our Legislature must respond. Should the fact that the judgment under federal law is granted by a state court mean that the judgment cannot be executed? That is the absurd result which the execution exemption mandates.

[10]Such a writ should command execution against state *monies* rather than state *property*, whenever possible, in order to minimize any potential interference with governmental functions. (See Code Civ. Proc., § 690.22, exempting from execution, inter alia, certain state property held for public use.) State monies are on deposit in commercial banking establishments. (See, e.g., Gov. Code, §§ 12320, 12325.)

This does not end the inquiry, however. The Legislature should not be allowed to relitigate valid judgments decided by the trial courts of this state. Failure by this court to deal with this unconstitutional usurpation of judicial authority would be a derogation of duty. Unfortunately, the logic of the dissent leads unswervingly to the acceptance of judicial impotence to enforce *concededly* valid judgments. Moreover, it would sound the death knell for the time-honored rule that no legal right shall be without a remedy.

Both majority and dissent invoke the separation of powers doctrine. Neither concedes that there are two separate problems with that doctrine. In reality, the dissent is correct when it opposes judicial appropriation and the majority is equally correct when it protests legislative readjudication of a final court judgment. Unlike my brethren, I would acknowledge the constitutional clash between the powers of the judicial and legislative branches of our government and attempt to forthrightly "set the stakes along the common boundary between these zones of power." (*Brydonjack* v. *State Bar, supra*, 208 Cal. at p. 444.)

A democratic government cannot exist without comity. Each branch of government must respect the legal actions and inherent powers of the other branches, if the democratic process is to work. In the name of the doctrine of separation of powers, this court should not protect the inherent authority of the judiciary without giving due regard to the inherent authority of a coequal branch of government. The court should not attempt to remedy the Legislature's violation of separation of powers by usurping legislative power and virtually appropriating the needed funds itself. Such an action equally violates the spirit of the separation of powers doctrine.

The Legislature has steadfastly refused to recognize the legal obligation the state owes to these attorneys for their work. Just as any citizen of the state must pay his or her legal debts, the State of California should also pay its legal debts. No one should have to repeatedly petition the Legislature to obtain what is due him or her. No citizens should be forced to repeatedly turn to the courts for relief. If the State of California expects its citizens to pay their obligations to the state in the form of taxes (the very source of legislative appropriations), it cannot legally or constitutionally ignore its own fiscal obligations.

The plaintiff should have a valid legal means by which to obtain state compliance with her judgment. The trial court should follow the tra-

ditional method courts use to execute valid legal judgments against private parties. In this way, the courts would use inherent *judicial* power to remedy an unconstitutional act instead of usurping the *legislative* power of the purse by deeming that an appropriation was made which, in fact, was refused.

The traditional rule that the state's assets are always immune from attachment and execution is illogical and anachronistic. More importantly, it is unconstitutional insofar as it permits the Legislature to step into the shoes of a judge to decide if and to what extent the state is obligated to pay a given judgment. When the Legislature relitigates the issues underlying a court's judgment, without any reason, it substitutes a *legislative* adjudication for a valid judicial decision. This is not permissible under the Constitution.

A confrontation between the branches of government would be averted if this court (1) acknowledged that the judicially created common law rule exempting the state from its own execution laws is anachronistic; and (2) recognized that it is a violation of the separation of powers clause for the Legislature effectively to deny a remedy to a citizen with a valid legal judgment against the state. The right to sue is meaningless without a remedy. If the remedy is dependent upon a specific appropriation on a case-by-case basis, it is a remedy dependent on whim rather than law.

Under the resolution suggested herein, the Legislature's constitutional authority to appropriate funds would remain intact, and the courts' power to adjudicate and enforce legal claims would be upheld.

This procedure would remedy the legislative usurpation of judicial authority without the courts exercising any powers that are not essentially judicial. The trial courts could enforce their decisions when the state, through an act of the Legislature, refused without reason to pay a valid court judgment. Finally, the power of execution would be used only after the Legislature had been given every opportunity to comply with the court's order to pay the state's valid legal debts.